PAN AMERICAN PETROLEUM CORPO-
RATION and Socony Mobil Oil Com-
pany, Inc., Appellants,

v.

W. W. LONG et al., Appellees.

SOUTHWESTERN LIFE INSURANCE
COMPANY and Valley Royalty Cor-
poration, Appellants,

v.

PAN AMERICAN PETROLEUM CORPO-
RATION and Socony Mobil Oil Com-
pany, Inc., Appellees.

No. 21159.

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1964.

Rehearing Denied March 3, 1965.

J. K. Smith, Fort Worth, Tex., Roy L. Merrill, Houston, Tex., Jack W. Flock, ·Charles F. Potter, Tyler, Tex., Wardlow ·L. Lane, Center, Tex., R. T. Wilkinson, Jr., Houston, Tex., Ramey, Brelsford, Hull & Flock, Tyler, Tex., Spruiell, Lowery, Potter, Laster & Guinn, Tyler, Tex., for appellants.

John W. Ford, Kilgore, Tex., James P. Swift, Paul McCarroll and Swift, Walsh, McCarroll & Wood, Dallas, Tex., for appellee.

Robert S. Mizell, Golden, Croley, Howell, Johnson & Mizell, Dallas, Tex., amici curiae.

Before RIVES and BROWN, Circuit Judges, and GARZA, District Judge.

JOHN R. BROWN, Circuit Judge:

This case is another chapter in the litigation arising out of the recent slant hole oil episode in the East Texas field, this time involving two parties innocent of any purposeful wrongdoing. The question here is whether the slanted-on oil company may recover from a financial institution the proceeds of the stolen oil received by it from the purchasing pipelines in payment of loans and production payments made to or purchased from the slant-holing operator. There are two subsidiary questions. One is whether the Texas two-year Statute of Limitations, Vernon's Ann.Tex.Civ.Stat. art. 5526 (1958), applies to limit the oil company's recovery to proceeds received during the two-year period immediately preceding the filing of this action. The other is whether the financial institution must be given credit for the amount it received but paid over to its debtor pursuant to the mortgage or production payment agreement, such amount being in excess of the required monthly payments. We have concluded that the Trial Court was correct in holding Southwestern Life liable for conversion to the extent of all proceeds received during the two-year period. We therefore affirm.

Pan American and Socony Mobil,[1] leaseholders on the east side of the field brought this action for conversion [2] of oil and gas beneath their tracts against (1) the operator (H. L. Long) of the Long lease adjoining them to the west, (2) the owners of various interests in the Long lease (W. W. Long, Charles R. Stubblefield, and Mrs. Sarah Long Erickson), and (3) Southwestern Life and Valley Royalty.[3] The jury in response to special interrogatories found that of the eleven wells on the Long lease, three were deviated and bottomed under the Pan Am lease and one, under the Socony lease; that all production from the Long lease came from the Pan Am-Socony leases; that the slanted wells were drilled with Long's knowledge; that operator Long had fraudulently concealed the slant drilling from Pan Am; and that Pan Am had no actual knowledge of facts which would have put them to inquiry, nor through the exercise of

---

1. Socony Mobil intervened and was aligned with Pan Am. Both will be referred to as Pan Am, as their interest and position, unless otherwise indicated, is the same.

2. Pan Am alone also relied on a theory of money had and received or restitution.

3. Valley Royalty is a wholly owned subsidiary of Southwestern Life, and in all matters their interest is the same. We refer to both as SWL unless otherwise indicated.

reasonable diligence would they have known of the slant drilling.

With this foundation, the Trial Judge entered judgment against Operator Long for the market value of $7/8$ of the oil produced over the entire 13-year period of operation of the Long lease against the other lease interest owners for the amounts they actually received during this same period; and against SWL for amounts received by it during the last two years (with interest, $232,145.42).[4] Because of Operator Long's fraudulent concealment and Pan Am's not being put on notice, the statute of limitations was tolled as to him, but not as to SWL. Only Pan Am and SWL have appealed.

### The Loan and Production Payment Transactions

Between 1955 and 1960, SWL, by itself and through its subsidiary Valley Royalty, engaged in a series of loan and production payment transactions[5] with the owners of the operating interest in the Long lease. The first was a loan of $140,000 by SWL to H. L. Long which a year later was renewed and increased to $221,366.87. Both of these loans were secured by essentially identical deeds of trust (mortgages) on Long's interest in the leasehold. These instruments in addition to restricting Long's actions through various covenants[6] and giving

---

4. It was stipulated that the total amount paid to SWL by the pipeline-purchasers was $312,317.26 and that of this amount, $214,336.69 was received during the preceding two years. Of this latter amount, $100,085.18 was paid over to the other interest owners in groups (1) and (2) above.

5. In chronological order they were:

| | | |
|---|---|---|
| Loan No. 17908 | SWL to H. L. Long | $140,000.00 |
| Loan No. 19062 | Renewal and increase of 17908 | 221,336.87 |
| Production Payment No. 39 | Reserved by H. L. Long from assignment to Stubblefield and conveyed to Valley Royalty which in turn conveyed to SWL | 190,000.00 |
| Production Payment No. 42 | H. L. Long to Valley Royalty and then subsequently to SWL | 50,000.00 |
| Production Payment No. 43 | W. W. Long to Valley Royalty and then to SWL | 25,000.00 |
| Production Payment No. 44 | Sarah Long Erickson to Valley Royalty and then to SWL | 9,300.00 |
| Loan No. 22502 | SWL to W. W. Long | 25,000.00 |
| Loan No. 22505 | SWL to Sarah Long Erickson | 9,000.00 |

---

6. The symbol SWL has been substituted throughout for the full title of Southwestern Life.

Among the more important obligations imposed upon the Grantor (Long) were:

"(3) That the aforesaid leases and leasehold estates covered hereby are in full force and effect and * * * that he will do or will cause to be done all things and perform all acts necessary or proper to maintain said leases in full force and do or cause to be done all things required and necessary to prevent a forfeiture thereof.

"(4) To continuously operate or cause to be operated in a good and workmanlike manner the wells now or hereafter existing on the above described premises and in accordance with the best usage of the field and in accordance with the rules and regulations of the Railroad Commission of the State of Texas and of the government of the United States or any agency thereof and to promptly pay all bills for labor and material incurred in the drilling of any additional wells and in the operation of said wells.

"(5) That the grantor herein will not at any time prior to the time of a final and complete release hereof encumber or allow to be encumbered any of the properties covered hereby and in connection with the development, operation and equipment of said leases covered hereby will promptly pay or cause to be paid before delinquency all contractors, subcontractors, laborers and material-men for labor, work, supplies and materials furnished in connection therewith.

"(6) To pay all taxes and assessments of every kind and character charged, levied or assessed against the properties

SWL various and considerable powers with regard to the operation of the well,[7] as an additional security, contained an "assignment of runs" clause,[8] whereun-

hereinabove described, or any part thereof, before any such taxes or assessments shall become delinquent.

"* * *

"(8) That at this time the grantor herein is lawfully seized and possessed of each and every part of the properties herein described and conveyed; that the same are free and clear of any and all liens and claims * * *. If, during the pendency of this loan, the title to the properties herein described * * * is challenged, or if the security of this debt is questioned or attacked directly or indirectly by suit or otherwise, the grantor herein binds himself * * * to protect and save harmless SWL * * * from any and all cost, loss, damage or claim by reason of the title or the priority of this lien being questioned and SWL shall be authorized at the cost and expense of the grantor herein * * * to take such steps as in its judgment may be necessary for the protection of its interests * * * and * * * SWL * * * shall have the right * * * to direct the prosecution or defense of the interest of the grantor herein * * * and all expenses * * * incident to any action taken * * * shall become a part of the indebtedness secured by this deed of trust * * *.

"(9) To keep and maintain all improvements and all personal property and equipment of grantor herein now situated on said leases and lands and used or obtained in connection therewith in a good state of repair and condition and not to tear down or remove the same or permit the same to be torn down or removed.

"(10) To permit SWL * * * at all times to go upon, examine and inspect and remain on the mortgaged properties and to go upon the derrick floor of any well at any time drilled or being drilled thereon and to furnish to SWL * * * all pertinent information in regard to the development or operation of mortgaged properties."

7. "ADDITIONAL RIGHTS AND
 REMEDIES

"If the grantor herein * * * shall fail to comply with the covenants and agreements in this instrument contained, the SWL * * * may, but shall not be obligated to: Perform the same for the account and at the expense of the grantor * * * and any and all expense incurred and paid in so doing shall be payable by the grantor * * * to SWL * * *

with interest at the rate of TEN PER CENT (10%) per annum * * * and the amount thereof * * * shall be secured by and under this deed of trust and the amount and nature of the expense and the time when paid shall be held fully established by the affidavit of any officer or agent of SWL * * * provided, however, that the exercise of the right of advance shall in no wise be considered and constitute a waiver of the right of SWL * * * to declare the indebtedness secured by this deed of trust to be at once due and payable.

"Should the grantor herein * * * at any time fail to properly operate the mortgaged properties in the manner required herein or should they make default in the payment of any indebtedness secured hereby or in the performance of any of their obligations hereunder, then in addition to the other rights and remedies SWL * * * shall have the right * * * *to take over the operation of said properties and produce the oil, gas and other minerals therefrom and market the same,* applying the proceeds derived from the sale thereof, first, to the cost of maintenance and operation of such properties; and, second, to the payment of all indebtedness secured hereby, principal and interest * * * and the balance thereof, if any, to be paid to the grantor herein * * *. Upon such payment of all such costs and indebtedness such properties shall thereupon be returned to the grantor herein * * * in as good condition as when taken over, ordinary wear and tear excepted."

8. "ASSIGNMENT OF RUNS

"As additional security for the payment of all indebtedness secured hereby * * * *the grantor herein does here transfer, assign and convey unto SWL * * * all of the oil, gas, condensate, distillate, all other liquid hydro-carbons and all other minerals saved and sold from the above described leasehold estates, and the proceeds of the sale thereof* after the deduction of gross production or severance taxes from and after the first day of February, 1955, at 7:00 AM, and the grantor herein hereby directs any purchaser now or hereafter taking the production from said premises to pay to SWL * * * the proceeds derived from the sale thereof, and to continue to make such payments until notified in writing by the SWL * * * to discontinue the same and the grantor herein further authorizes and empowers

der all proceeds from the sale of oil and gas would go directly from the purchasing pipeline to SWL. Under the provisions of the initial and renewal mortgages, 80% of .the amount received from the pipeline each month would be applied to retire the debt, any excess, under ordinary conditions, going to the debtor-Long. In the event 80% came to less than a fixed monthly figure ($1,963.00 in the first instrument), the percentage retained by SWL could be escalated as high as necessary to reach the specified amount, up to 100%.[9]

The "assignment of runs" clause contained a direction by the "grantor"-Long to any purchaser (pipeline) to pay all proceeds to SWL.[10] In addition, a separate division order to the pipeline was executed by Long and SWL which recited that production having been transferred, credit should be given SWL for oil extracted from the Long lease. The division order, executed on a pipeline company form, declared the undersigned

to be the "legal owners of the interest" and warranted their title thereto. Paragraph 4 then purported to dispose of the oil:

"4. In the absence of written agreement to the contrary, oil received under this division order shall become your property when delivered to said pipeline company, and shall be paid for to the party or parties according to the divisions of interest shown above * * *."

By a stamped clause above its signature, SWL made the express disclaimer "without warranty of any kind either expressed or implied." When the loan was renewed and enlarged, the same division order was continued in effect.

There were several production payment transactions, the principal one presumably being in the form, or to achieve the effect, of the customary ABC transaction.[11] H. L. Long first conveyed his interest in the leasehold to Stubblefield re-

SWL * * * to receive, collect and hold all sums of money paid to it hereunder and to apply the same in the manner provided in the note this day executed by the grantor herein, payable to SWL and without any liability or responsibility on the part of said SWL * * * save as to good faith in so applying and receiving said sums; but no other person * * * shall be charged with notice of any of the provisions of said note and shall not be under any duty or obligation to inquire into the right of SWL * * * to receive the same, what application is made thereof, the amount of indebtedness owing, or as to any other matter; * * *

"Should any purchaser take the production from said premises and fail to make payment promptly to SWL * * * in accordance with this agreement, then SWL * * * shall have the right to demand a change of connection and to designate another purchaser with whom a new connection may be made, without any liability on the part of SWL * * * in making such selection, so long as ordinary care is used in the making thereof; and upon failure of the grantor herein * * * to consent to such change of connection, the whole indebtedness secured hereby may be immediately declared due and payable at the option of SWL * * * and said properties shall

become subject to foreclosure proceedings hereunder. * * *"

9. The language of the deed of trust payment provision is as follows:
"Being due and payable in not to exceed eighty-four (84) monthly installments, one installment being payable on the 25th day of each month, beginning March 25, 1955, as follows: Eighty percent (80%) of the gross monthly income and revenues (remaining after deduction of taxes for gross production and severance) accruing from and after February 1, 1955, at 7:00 AM, of and from the mineral leasehold interests described as the [Long] Lease in this deed of trust shall be applied monthly as received; provided that if in any month 80% of the said gross monthly income and revenues is less than $1,963.00, then the percentage of the gross monthly income arising from such mineral leasehold interests shall be increased by such percentage up to 100% if necessary, and for so long as is necessary to provide a monthly payment of $1,963.00, but such percentage shall never be less than 80% of such gross monthly income * * *."

10. See note 8, supra.

11. See United States v. Witte, 5 Cir., 1962, 306 F.2d 81, 87–88.

serving a production payment equal to 90% of the production until he had received, free of expense, $190,000 plus interest [12] and specified taxes. On the same day, Long then transferred this production payment to Valley Royalty in exchange for $190,000. Valley Royalty borrowed this amount from SWL giving as security a deed of trust [13] on the production payment which contained an assignment of runs similar to the one previously described in the SWL-Long transaction. All four parties (Stubblefield, Long, Valley Royalty and SWL)

12. There was also a provision for payment of 7% interest to the grantor out of production.

13. After reciting the conveyance to the Trustee, the instrument provided:

"INDEBTEDNESS SECURED

"This conveyance is made in trust, however, to secure and enforce the full, complete and prompt payment when due of:

"(1) All sums called for, owing and to be owing upon one certain promissory note of even date herewith, executed by Valley Royalty Corporation, bearing interest as therein provided, payable to the order of SWL in the sum of * * * $190,000.00 * * *. Being payable in not more than eighty-four (84) monthly installments of principal and interest * * * as follows: All payments payable to the [Valley] hereof * * * by the pipeline company or other purchaser * * * of the oil, gas * * * reserved by virtue of that certain production payment * * * shall be applied as received, first to the payment of any * * * taxes then * * * payable by reason of the ownership of said production payment, next to the payment of all interest then due * * * on this note, next to the payment to [Valley] * * * of a sum equal to interest at the rate of one-half of one per cent (½ of 1%) per annum for the next preceding month, on the unpaid balance of the primary amount of said production payment, and the remainder of such payments from such * * * purchaser, shall be applied to the payment of the principal of this note * * * shall be remitted to Charles R. Stubblefield * * *."

Compared with the stringent restrictions and obligations imposed on Long when he was the borrower from SWL (see notes 6 and 7, supra), we have these scant provisions where the borrower is an affiliate:

"(a) That no right nor remedy in favor of Mortgagee granted in or secured by this instrument shall be considered as exclusive, but all rights and remedies hereunder shall be cumulative of each other, and of all other rights and remedies and securities which the holder of said note may now or hereafter have securing the above indebtedness.

"(b) To pay all taxes and assessments of every kind and character charged, levied or assessed against the property hereinabove described, or any part thereof, before any such taxes or assessments shall become delinquent.
" * * *

"ASSIGNMENT OF PROCEEDS OF RUNS

"For the * * * purpose of additionally securing the indebtedness * * * and to facilitate the payment * * * of said indebtedness * * * Grantor * * * does also hereby * * * assign * * * to SWL * * * all of its interest in the proceeds of the sale of oil, gas and casinghead gas produced, saved and sold from the above mineral leasehold estate from and after February 1, 1960, at 7:00 A.M. This assignment is upon the following terms and agreements, viz:

"1. Any and all persons * * * purchasing oil, gas and casinghead gas produced * * * from the above described tracts of land * * * are hereby authorized and directed to pay directly to SWL the proceeds of the sale of the interest evidenced by said production payment in all such production, and to continue such payments until furnished with a release hereof executed in writing by SWL.

"2. SWL is authorized to receive, collect and receipt for the proceeds of the sale of the oil, gas and casinghead gas assigned it hereunder, and to apply the funds so received by it in the manner hereinafter specified. * * *."

218

executed a division order,[14] again similar to the one previously described, directing the pipeline to make payment for the oil it purchased to SWL (90%) and Stubblefield (10%). About a year and a half later, Valley Royalty assigned the production payment to SWL in exchange for cancellation of the debt and the deed of trust.

Thus the end result was that SWL stood in the shoes of the original Grantor-Owner of the reserved production payment. It had the same rights to payment as did Long and all of the obligations which were binding on the Grantee Stubblefield inured to its benefit. Although the production payment was out of 90% of the production, the conveyance prescribed that under ordinary conditions 85% of the proceeds would be applied to the production payment, so long as 85% was equal to $2,800 for each month (any excess going to the Grantee Stubblefield). If it was not, then the amount to be retained and applied could go as high as 90%. If 90% was less than $2,800 for any month, the deficiency was recoverable in future months by raising the percentage of the proceeds retained to 90%. This rather elaborate system of payment could be laid aside at any time, however, by the simple expedient of SWL giving Stubblefield 30 days' notice that it intended to retain the full 90% reserved.[15]

The activities of Grantee Stubblefield as a co-owner and the operator of the lease were seriously restricted by numerous covenants in the reservation of the production payment. In addition to limiting the Grantee's own actions,[16]

14. "DIVISION ORDER
"To MOBIL OIL COMPANY * * *
 "Effective 7:00 a.m. February 1, 1960
 "The undersigned certify and guarantee that they are the legal owners of the interests set out below opposite their names in the oil produced from the H. L. Long [lease]. * * * [A]nd until further notice you are authorized to receive oil therefrom, giving credit as directed below:

| CREDIT TO | Division of Interest | P.O. ADDRESS (Give box number or street address) |
| --- | --- | --- |
| Charles R. Stubblefield | 10% of 21/32 of 7/8 WI | 531 Petroleum Bldg. Tyler, Texas |
| Southwestern Life Insurance Company, A/C Valley Royalty Corporation | 90% of 21/32 of 7/8 WI | P.O. BOX 2699, Dallas, Texas |

Per assignment executed by H. L. Long in favor of Charles R. Stubblefield and Production Payment Assignment executed by H. L. Long in favor of Valley Royalty Corporation and Deed of Trust and Assignment executed by Valley Royalty Corporation in favor of [SWL's Trustee] * * * the above total interest heretofore owned by H. L. Long will be paid as indicated above until Mobil Oil Company * * * is notified in writing to the contrary at its Dallas, Texas office."

15. "* * * Grantor reserves the option to apply upon this production payment the full 90% interest in the production from the leasehold interest herein assigned, upon giving to Grantee thirty (30) days' written notice of Grantor's intention to do so. * * *."

16. "1. [The Grantee Stubblefield covenanted that he would do everything necessary to keep the lease in effect and to continuously operate] * * * in a good and workmanlike manner in accordance with best field practices, each and all of the wells which have heretofore been drilled, or which may hereafter be drilled on the tract of land hereinabove described.

"2. Grantee * * * covenants that he will comply with or cause to be complied with, all pertinent lawful rulings and

paragraph 10 of the covenants gave SWL, as the owner of the production payment, the right, upon determining that the property was not being operated in a prudent manner, to take over complete operation of the well.[17] The other loan and production payment transactions [18] were substantially similar in form and content [19] to those described above.

## I.

## Conversion

 In this case, ascertainment of the applicable legal rules governing the tort of conversion presents no real difficulty, and the problem is whether under these circumstances, conversion is made out. Although the formula has been variously worded by the Courts of Texas, the fundamentals of conversion have been fairly consistently defined. In its brief SWL states a definition which apparently has garnered wide acceptance. Conversion is

" * * * the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of

orders of the Railroad Commission of Texas, and of such other administrative agencies or bodies which may * * * be * * * constituted to regulate production * * * of oil, gas and casinghead gas * * *.

"3. Grantee covenants that he will maintain, preserve and renew all the rights, rights-of-way, easements, privileges and franchises * * * which are reasonably necessary in the proper operation of said oil and gas leases, and make such payments and do such other acts or things as may normally be necessary or proper to keep said * * * privileges and franchises valid and subsisting.

"4. Grantee covenants that until the aforesaid reserved production payment interest shall have fully terminated as herein provided, he will replace and/or repair any equipment * * * on said land that may be lost or damaged * * * and * * * Grantee covenants that he will carry * * * insurance upon such equipment, * * * insuring against such hazard and risks in amounts satisfactory to Grantor * * *.

"5. Grantee covenants to pay * * * all lawful taxes of every character in respect to all of the hereinabove described property, and all taxes that may be levied or assessed against the oil, gas and casinghead gas produced and to be produced from said leases * * *.

"6. Grantee covenants * * * to maintain, preserve and keep said property * * * and equipment of every kind and nature in respect to said oil and gas leases in good repair, working order and condition * * * to the end that * * * such property shall be * * * kept in such condition as * * * to permit the most efficient * * * operation thereof.

"7. In respect to all of the property * * * Grantee covenants promptly to pay all bills for labor and material, and never to permit to be affixed thereon any lien, * * *.

"8. Grantee covenants that Grantor shall at all times have the right to go upon, examine, inspect and remain on the aforesaid property, and to go upon any well or wells thereon, and to strap, gauge, measure and inspect any and all tanks at any time on said land.

"9. * * *."

17. "10. * * * Grantee expressly agrees that in the event Grantor * * * should at any time * * * *deem* the property not to be operated in a prudent manner, then the holder of said production payment interest * * * may * * * take possession of the oil, gas and mineral leasehold estate *subject to such production payment interest*, and * * * develop and operate said property for the production of oil, gas and other minerals and in such event, all * * * money expended in * * * workover operations, drilling of wells, and operation costs, shall be chargeable as a lien against the leasehold interest herein assigned to the Grantee * * * which said lien may be collected out of the production credited to such assigned portion of the leasehold estate * * *."

18. See note 5, supra.

19. The H. L. Long $50,000 carved-out production payment was in exactly the same form as that described above, and the same is true of the loans by SWL to W. W. Long and Sarah Long Erickson. The language used in the carved-out production payments conveyed by W. W. Long and Sarah Long Erickson to Valley is not the same as described, but we think there is no operative difference, and none is asserted by the parties.

the same rights by the owner, * *." France v. Gibson, Tex.Civ.App., 1907, 101 S.W. 536.[20]

From all definitions encountered the rubric seems to be some distinct act of dominion or control over the personal property of another.[21] The convertor may either have actual or constructive possession of the property.[22] Although the act of control or dominion must be positive and affirmative[23] (mere non-feasance will not do), a wrongful or fraudulent intent or purpose is not required,[24] and the presence of good faith in the convertor is relevant only on the issue of damages.[25] Only where the owner is seeking to recover the actual property itself rather than the value thereof, or with more particular reference to the slant hole cases, where the slanted-on owner seeks recovery from the adjoining working interest owner, who in developing and operating the lease has incurred "costs of production"[26] does the presence of good faith mitigate or alter the recovery.[27]

■ The question then, one of pure law, is whether by the receipt and disposition of the sales proceeds from the pipeline purchaser pursuant to the terms and conditions of the mortgages and production payment instruments, assignments of runs, and the division orders— all of which invested SWL with the broadest operational powers—there is present the necessary exercise of dominion or control over the property of Pan Am by SWL to constitute conversion.

■ To vary the facts slightly, if under the terms of a mortgage SWL had actually, physically received the oil— either directly or through a specifically designated agent—and then made some disposition of it, even though the funds were applied in payment of the note, SWL concedes, as it must, that it would be liable for conversion.

But since this did not physically take place, SWL insists throughout its several briefs that this case must be treated as one where the thief sells the stolen property and then pays the proceeds to an innocent third party on a debt, and the general rule that the wronged owner in his action for conversion can only trace the property, not the proceeds,[28] applies to prevent recovery.

20. See Tex.Jur.2d *Conversion* § 1 for numerous citations to slightly variant definitions.

21. A functional and inclusive definition is that proposed by the American Law Institute Revision Committee: "an intentional exercise of dominion over property which so seriously interfered with the right of another to control it that the actor may justly be required to pay the other the full value of the property." Restatement, Torts § 222A, at 24 (Tent.Draft No. 3, 1956).

22. Sandor Petroleum Corp. v. Williams, Tex.Civ.App. error ref'd n. r. e., 1959, 321 S.W.2d 614; Stidham v. Lewis, Tex. Civ.App., 1929, 23 S.W.2d 851, 852.

23. Gulf, C. & S. F. R. Co. v. Pratt, Tex. Civ.App., error ref'd, 1916, 183 S.W. 103.

24. Williams v. Deen, 1893, 5 Tex.Civ.App. 575, 24 S.W. 536. Prosser states: "The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A pur-chaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a convertor, since his acts are an interference with the control of the property." Prosser, Torts § 15 (2d ed. 1955). See also Restatement, Torts § 221, comment c (1934); 14 Tex.Jur.2d *Conversion* § 2.

25. Restatement, Restitution § 128, comments c, k (1937).

26. Harrington v. Texaco, 5 Cir., 1964, 339 F.2d 814.

27. There is no question involved as to the good faith of SWL. Although it had the power under the deed of trust and production payment instruments to make full investigation, there is neither intimation nor indication that SWL was in any way connected with or had any knowledge of Operator Long's slant drilling.

28. Cited directly in opposing recovery on the theory of money had and received, and at least obliquely as to conversion is the classic case of Holly v. Domestic and Foreign Missionary Society, 1901.

■ But the case cannot be so viewed. Of course, from the standpoint of benefit, SWL although exercising a different and perhaps lesser control over the oil, has nevertheless been benefited in the same manner as though it had obtained actual possession of the oil and then disposed of it. But this may not be pressed too far. For the nature or amount of the benefit to the party accused of conversion is not decisive because had the person who stole the oil simply sold it to a third party and then paid the proceeds to SWL on a debt, there being no mortgage assignment of runs plus a division order and the like, there would be no conversion by SWL. What is critical is the nature and degree of control over the property in question.

But before examining the nature and sufficiency of control as such, the analogy of the simple case of a debtor using proceeds of stolen property to pay a debt is a long way from the situation here involved. Pursuing this approach, the case is more like that in which T, the thief, pledges or mortgages stolen property as security for a loan from C, the creditor, who thereafter obtains and applies on the debt the proceeds of a foreclosure sale. The Holly concept of the negotiability of currency would hardly protect C against a conversion claim by O, the rightful owner.

■ But the case easily satisfies the requirement of control. Here SWL's control over the property, though less than actual possession as mentioned above, is far more extensive than that which attaches to whatever proceeds a debtor may have in a simple creditor-debtor relationship. Here we are confronted with an elaborate and sophisticated scheme of financing bearing the marks of the careful hand of knowledgeable counsel, obviously designed primarily to securely bind up and protect the financial institution's investment in an enterprise having its own known hazards and risks, both legal and operational.[29] In concluding that SWL exercised enough dominion or control over Pan Am's property to be held for conversion, we focus primarily on three things, which both the deeds of trust and production payments have in common. These are the covenants, the assignments of runs, and the division orders.

### The Covenants

A casual reading of the covenants[30] reveals that SWL had considerable power over both the person of the operator and the lease itself. In the deeds of trust (note 6, supra), the mortgagor covenanted, among other things, to keep the lease in full effect and to operate it continuously in accord with government agency regulations, to pay promptly all bills, to prevent materialmen's or laborer's liens from arising, to pay promptly all taxes and other assessments, to keep and maintain—and not remove—any and all improvements and personal property located on the lease, and to permit SWL full inspection. Should the pipeline fail to make payment promptly, SWL had the power to change connections and designate another purchaser (note 8, supra).

And further in the production payment instrument (note 16, supra), the operator was bound to maintain, preserve, and renew all rights of way and easements necessary to production, to replace any damaged lease property including the obligation to insure with such carrier and in

180 U.S. 284, 21 S.Ct. 395, 45 L.Ed. 531; approved for Texas in Burnett's Trust v. Farmers State Bank in Mexia, Tex.Civ.App., error ref'd w. o. m., 1943, 175 S.W.2d 453. The spirit of this rule permeates SWL's entire approach to this case.

29. A secondary purpose, with regard to the production payments, was to exploit for the mutual and legitimate benefit of all parties the economic advantages flowing from the unique tax advantages of this type of transaction. See, United States v. Witte, 5 Cir., 1962, 306 F.2d 81, 87–88. Although some may undertake to analyze separately the consequences of a mortgage and production payment on the liability of financial institutions, we believe that for our purposes here the two can be treated together since we find the consequences identical.

30. See notes 6, 7, 16, 17 and 19, supra.

such amount as was satisfactory with SWL.

In all instruments there was provision for SWL, upon the failure of the obligated party to perform properly any covenant, to take over the lease and do whatever was necessary to operate the wells to obtain and *sell* the production (see notes 7, 17, and 19, supra). The operative language in the instruments indicates that it would take only slight nonperformance to trigger this power, allowing SWL to come in to run the whole show, if it chose to do so. Under the terms of the Long Mortgage, SWL was empowered to take over should Mortgagor-Long "at any time fail to properly operate the mortgaged properties in the manner required herein" (note 7, supra). In the long production payment instruments, SWL was given the express power to determine itself that the property was not being "operated in· a prudent manner," and then to take over all aspects of operation [31] (note 17, supra). Likewise, the W. W. Long and Sarah Long Erickson carved-out production payment instruments provide that on the Grantor-Assignor's failure after 30 days' notice to "strictly" comply with all "covenants, obligations, promises and undertakings," SWL may "take over, manage, develop and operate" the lease, and "sell all of the oil, gas and other hydrocarbons produced * * * [from the lease] * * *" and "* * * apply the proceeds * * * to the liquidation of the Production Payment * * *".

The right to take over and operate the lease, selling the production and applying the proceeds in the specified manner, involved far more substantial dominion and control over the mortgaged property and its yield than if SWL had been limited to the Trustee's outcry atop the courthouse steps. And the fact that these powers to take over the lease were not exercised does not detract from the substantiality of the control which these powers gave SWL over Long,[32] who, in turn, was in control of all the lease operations. To the contrary, the pudding's eating proved the wisdom of those who conceived and those who executed this intricate arrangement which allowed SWL to profit with safety—or would have, had the underlying security not been "hot."

### The Assignments of Runs and the Division Orders

The assignments of runs (see notes 8, 13 and 19, supra) in express terms are an absolute conveyance to SWL, for a limited purpose, of the minerals "saved and sold" or the "proceeds" of the minerals "saved and sold", or both, from the Long lease. In addition to this terminology, there is also language directing the purchasing pipeline to pay the proceeds to SWL, according to its designated fractional interest, until notified to cease by SWL. The function of the division orders (see note 14 and in text following note 10, supra) was to put this conveyance and direction into practical effect.

As previously outlined, these division orders were executed by all parties having an interest in the production and instructed the pipeline as to the parties entitled to payment. The pipeline protected itself by obtaining a warranty that the parties who appeared on the order were in fact the legal owners of the interest in question or entitled to receive the designated payment for the oil. That SWL qualified its signature with the phrase—"without warranty of any kind either expressed or implied"—is of no significance. This limitation, perhaps effective to protect SWL from some claims by the pipeline, can have no effect in this suit by the owner of the stolen oil, who, of course, was not a party to the division order. More importantly, although SWL did not affirmatively warrant its title, it did at least represent that it was

31. Because of the many powers and duties imposed upon the "operator," both by the Texas Railroad Commission and by common law rule, this Court has attributed substantial importance to an individual's being the "operator" in other slant hole situations. See Harrington v. Texaco, 5 Cir., 1964, 339 F.2d 814.

32. Reference here to "Long" includes, of course, his assignees such as Stubblefield.

entitled to payment for the oil as between itself and the purchaser. Moreover, Pan Am does not seek recovery on a theory of warranty, but rather of conversion, and the fact that the division order, as to SWL, was not a warranty of title, does not keep it from being a spectacularly significant indicia of the exercise of substantial dominion and control over the oil by SWL. In the business world at least, the sale and the asserted right to receive payment are the strongest indication of control.

In answer to Plaintiffs' conversion theory, SWL urges alternatively (1) that the division order does not amount to a contract to sell any oil, or (2) if it is a sale contract, it purports to sell and transfer only that oil which was produced from the Long lease, and not any of that produced from Pan Am's adjacent lease. Therefore, it argues, under either view, the division order is no evidence either of constructive possession, of control or the right to control, of any of Pan Am's property.

■■■■ First, as to the nature of division orders in general, what judicial statements there are refer to other kinds of situations. The Texas Supreme Court extended its "error refused" imprimatur to Stanolind Oil & Gas Co. v. Terrell, Tex.Civ.App., 1944, 183 S.W.2d 743, which contained the statement that "A division order is ordinarily the contract under which the production is purchased or accepted for transportation by the pipeline company" (183 S.W.2d at 745). SWL, however, relies strongly on Smith v. Liddell, 1963, Tex., 367 S.W.2d 662, where the Supreme Court, with a different question before it, said a division order conveys no interest. The problem in Smith was whether, as between the

grantor and grantee of a fractional royalty interest, a division order which described more land than it should have amounted to a contract under which the grantee's rights were expanded to include the additional production. The Supreme Court answered in the negative that a division order was merely a direction to the pipeline telling it whom to pay, and was revocable. But under this decision there was no question that as to the oil produced and paid for in the past, the terms of the division order controlled. Moreover, Smith did not present to the Supreme Court the necessity of ruling on the nature of a division order as between the transferors of the oil and the purchasing pipeline. We therefore believe that with regard to this latter context, the law of Texas is that a division order is the operative instrument of transfer, whether called a contract or not, and until revoked is binding on the parties, who thereunder declare their present ability and intent to transfer, sell, or otherwise dispose of the oil to the pipeline, and their entitlement to payment for this same transfer. Indeed, SWL's right to revoke the division order is perhaps the strongest proof of its real control.

■■■■ SWL's second argument is based on a technical, literal reading of the instruments which refer to and purport to transfer only oil produced from the Long lease (see notes 8, 13, and 14, supra). Under this view the matter of critical importance is whether the language of the assignment of runs or the division order was in terms of oil *in* and *under* the lease rather than in terms of oil produced *from* certain wells on the lease—no conversion in the former, but conversion in the latter. In our case the language takes more of a middle course [33]

---

33. In the Long deed of trust (note 8, supra), the language is " * * * transfer, assign and convey unto [SWL] * * * all of the oil, gas, condensate, distillate, * * * saved and sold *from the above described leasehold estates,* and the proceeds of the sale thereof * * *. The language in the production payment is only slightly different purporting to reserve to Long a production payment out of 90% "of the total oil, gas and casinghead gas *in and un-*

*der* and which may be produced from the *leasehold* interest * * * assigned." Then in the assignment of runs Valley transferred to SWL "all of its interest in the proceeds of the sale of oil, gas and casinghead gas produced, saved and sold *from* the above mineral *leasehold* estate * * *" (note 13, supra). But the division order (note 14, supra) refers to "the interests set out below opposite their names in the oil produced *from* the H. L. Long * * *" lease.

and might pose some problems of construction for' situations in which the precise wording would be the critical factor.[34]

But the answer to this case is not to be found in a literal reading of these precise words. This argument overlooks the glaring fact that all of the oil for which SWL was paid—and which funds it has retained or disbursed to other than Pan Am—came from Pan Am's lease. Of course SWL never intended to get mixed up with stolen oil. But on the natural assumption that oil coming out of a well on a lease was oil coming *from* that lease, it is obvious that what SWL was really after was to secure its interest by getting its hands on the proceeds of whatever was produced from the Long lease. Oil, and the proceeds from the sale of oil, was the indispensable element. SWL, a life insurance company under heavy duties to policy holders and stockholders as well, had to have security for the loans and a real interest in production as to production payments it acquired. It was oil which Long would produce ostensibly from this lease, not Long's personal credit which made the transaction either economically attractive or feasible. It is perfectly understandable that SWL, a reputable institution, disclaims any purpose of intending to acquire an interest in oil owned, not by Long, but by others. But while preserving its honor and integrity as a proposition of initial intent, it does just that when it seeks to retain the benefits received directly from sales of stolen oil, made under its direction and control.[35]

## II.

### Credit For Conduit Disbursements

█ SWL asserts that if it is found guilty of conversion, its liability should be reduced by $100,085.18, this being the amount SWL received but did not retain. After satisfying its requirements as permitted under the terms of the deeds of trust or production payments, SWL paid this sum over to the other interest owners. The argument is that under the terms of the respective agreements (see notes 9 and 15, supra), SWL had no right to retain these funds and occupied the position of a mere conduit. But, as we explained earlier (see in text accompanying notes 9 and 15, supra), this is only part of the picture. If all went well and there was sufficient monthly production, so that the amount received from the pipeline was above the stated minimums, then SWL was to retain only 80% under the mortgage or 85% under the production payment. However, should production lag to where 80% or 85% fell below the fixed monthly minimum figure, then SWL, under the terms of the respective contracts, had the right to exercise the great advantage of retaining the full amount received from the pipeline—100% as to the mortgage, the full 90% as to the production payment. This process could be continued indefinitely—as long as was necessary for SWL to get its full share and to protect its contingent interests.

Secondly, SWL's right to retain the full amount was an extremely valuable complement to its power, under the circumstances delineated in the covenants, to take over complete operation of the well. Besides incurring operational expenses, SWL might pay taxes or litigate as it saw fit in the best interest of the lease, and in such event, access to the full amount of the proceeds was of great advantage to it.

34. For many purposes, even language purporting to transfer oil produced from certain *wells* would have to be construed as intending to transfer oil produced from the *lease*. To do otherwise, in view of the Railroad's Commission's straight hole rule, would be to construe the contract as illegal.

35. Having found an adequate basis for recovery in conversion, it is not necessary to pass on Pan Am's theory of money had and received, which may be less sure-footed, and could present some complications, dialectally at least.

The case of Hull v. Freedman, Tex.Civ. App., 1964, 383 S.W.2d 236, urged upon us by post submission letter, contains statements on the law of conversion not contrary to those here enunciated. The conclusion of no conversion in that case was on facts completely different from the situation before us in this case.

To protect itself, as it properly could do, SWL armed itself with broad powers. These powers were exercisable in the first instance through covenants imposing substantial operational obligations on the mortgagor or grantee of the working interest under production payment conveyances. Backing up performance by those parties was the right of SWL to take them over itself. And adding additional economic sanctions was this valuable right to retain money to reimburse itself for the cost of such operations. SWL was entitled not merely to reimbursement—a right which depended on the obligor's willingness or financial ability to perform, and the prospect of litigation to coerce it. SWL was given intial custody of the funds and the operational right to determine whether, and to what extent, some or all should be retained. Once SWL made that determination, it was perhaps a conduit. But the decision was its act, and one taken pursuant to protective powers which it had imposed. The right to make the decision, the right to make it effectively—i. e., by retaining money, thus putting the shoe on the foot of the other parties claiming it—were regarded as valuable rights to a businessman. The law is not required to debase them.

We therefore conclude that the Trial Court properly refused SWL credit for the stated amount. SWL exercised the same quality of dominion and control over the funds disbursed as over those retained—in both cases to the high disadvantage of their owner, Pan Am.

## III.

### The Two-Year Statute of Limitations

Pan Am, as Cross-Appellant, complains of the Trial Judge's conclusion that the Texas two-year Statute of Limitations, Vernon's Ann.Tex.Civ.Stat.Ann. art. 5526 (1958), applied to limit its recovery against SWL. The Trial Court correctly charged the jury on the issue of tolling the statute as to Operator Long under Pan Amer. Petroleum Corp. v. Orr, 5 Cir., 1963, 319 F.2d 612.[36] The jury found that Long fraudulently concealed the slant drilling and that Pan Am was not put to inquiry. Thus the statute was tolled as to Long. Pan Am's position is that as a matter of law the fraud of Long while operating the well (partially for the benefit of SWL) is imputable to SWL because of its agency relationship with Long. On this basis, the statute should be tolled as to SWL.

While the Court recognizes that one transaction may involve more than one kind of relationship, and even in this situation for some purposes Long may perhaps have been the agent of SWL,[37] as well as covenantor-mortgagor-grantor, etc., Pan Am is seeking to capitalize on this observable phenomenon in a way which challenges the imagination. Pan Am is willing to admit that Long, as the agent of SWL, "may" have exceeded his authority by deviating these wells in violation of common law and Railroad Commission rules, but insists that under accepted agency concepts, there is here a ratification which saddles the principal with this unlawful conduct. The argument is that (a) retention by SWL of the

36. In the Orr case the rules were stated to be:

"(b) limitation does not run and the statute is tolled in circumstances where the cause of action * * * has been fraudulently concealed by the defendant and is not discovered by plaintiff two years before filing suit if the plaintiff exercised reasonable diligence in seeking to discover the fraud after being put on inquiry; and (c) even if there is fraudulent concealment by the defendant, the plaintiff is required to act with diligence in seeking to discover fraud after being put on inquiry; * * *."
319 F.2d at 613.

37. Possibly offsetting this would be the strong Texas policy protecting investors from operational liabilities in the exploration, drilling and development of oil and gas ventures. See, e. g., Snodgrass v. Kelley, Tex.Civ.App., error ref'd, 1940, 141 S.W.2d 381; Berchelmann v. Western Co., Tex.Civ.App., writ ref'd n. r. e., 1962, 363 S.W.2d 875.

benefits of Long's wrongdoing (b) with knowledge amounts to ratification. The theory is good if—and the if is a very big one—element (b) is satisfied.

■■ But as to (b), SWL did not know—legally or actually—that it had received Pan Am's property until the jury so found or at the earliest, when the slant hole scandal revealed Long's misdeeds. Surely more is required for "retention with knowledge" than the circularly reasoned showing that when SWL found out (in court) where the oil came from, it failed to pay up—hence ratification. Apart from this theory of ratification which we find wanting, there is no basis under Texas law for tolling the statute. We thus hold that Pan Am's cause of action against SWL was properly limited to two years.

### IV.

### Separate Findings for SWL

■ SWL complains of the Trial Judge's overruling its motion for separate findings of fact and conclusions of law. The argument is that "no issues were or could be submitted to the jury with respect to these defendants [SWL], and with respect to them the case was tried upon the facts without a jury and they were entitled to findings of fact and conclusions of law under Rule 52."

The judgment was based on facts as found by the jury and those stipulated. The only questions with regard to SWL were the legal issues we have discussed at length. These questions were adequately answered in the judgment, and no prejudice whatsoever appearing, there is no reversible error, F.R.Civ.P. 61.

The judgment in all respects withstands each attack.

Affirmed.

GARZA, District Judge (concurring in part and dissenting in part):

I concur in the opinion of the majority with the exception of that part of the opinion under Section II where the majority fails to give credit to Southwestern Life for the $100,085.18 which it did not keep but turned over to others. With regard to this part of the District Court judgment, I would reform it to give Southwestern Life credit for this amount and reduce the judgment accordingly.

In Harrington v. Texaco, Inc., 339 F. 2d 814, I concurred in that part of the opinion making Harrington responsible for all of the money received from the sale of oil from the slanted oil well because Harrington was the designated operator and as such he was charged with duties and responsibilities that are not present in the case of Southwestern Life. It is conceded that there is no question involved as to the good faith of Southwestern Life; and there is neither intimation nor indication that Southwestern Life was in any way connected with or had any knowledge of operator Long's slant drilling.

The majority seems to lay great stress on the fact that the covenants, the assignment of runs and the division orders give great powers to Southwestern Life, and even allowed them to go in and operate the well; but the fact remains that Southwestern Life never did use the extraordinary powers that the majority refers to in the instruments involved in the loan transaction.

All the powers retained by Southwestern Life were to protect its loan, and I believe it would be against public policy for this Court to hold, under the circumstances, that Southwestern Life will have to lose not only its loan but also pay money that it did not keep, because of actions by borrowers of which they had no knowledge. It shocks my conscience to make an innocent party pay for money it never kept.

Under the facts of this case, I can see no difference in limiting the liability of Southwestern Life only to the extent that it has benefited, and the holding of this Court in Gulf Oil Corporation v. Lone Star Producing Co., 322 F.2d 28, at page 33, in which Judge Rives held that the Defendant Lone Star Producing Company was responsible for money which it had been overpaid by Gulf only to the

extent that it had been benefited from such overpayment.

The covenants, the assignment of runs and the division orders, to my mind, are what make Southwestern Life a converter, but they cannot be extended to make them liable for all the money received by them whether kept by it or not. The good faith of the converter, Southwestern Life, should mitigate the recovery against it and make it responsible only to the extent that it benefited by the payments to it.

It is common knowledge that most of the present oil and gas development is made on borrowed funds. If those that have money available for this purpose are to be subjected to losing not only what they lend but also be responsible for money received by others acting in bad faith, when the lender itself acts in good faith, to my mind makes the decision of my brethren one which is against public policy.

I would, therefore, reform the judgment as indicated above.

On Petition for Rehearing

PER CURIAM:

It is ordered that the petition for rehearing filed in the above entitled and numbered cause be, and the same is, hereby denied.

GARZA, District Judge:

In view of my partial dissent filed heretofore, I would grant the motion for rehearing as to the matters covered in my dissent.