**HARRISON et al. v. MacGREGOR.**

**No. 4838.**

Court of Civil Appeals of Texas. Amarillo.

Jan. 3, 1938.

Rehearing Denied Jan. 31, 1938.

Aldridge & Aldridge, of Farwell, for appellants.

J. D. Thomas, of Farwell, for appellee.

FOLLEY, Justice.

This was a suit in trespass to try title, involving the title and possession of section 28, syndicate block B, in Parmer county, Tex. We shall give the parties their trial court designation.

Paul MacGregor, of Tampa, Fla., was the plaintiff in the trial court. David Harrison, Jack Carr, W. M. Norton, and Oscar Lee Parker, all residents of Parmer county, were the defendants in the trial court. Harrison was an official of the Security State Bank of Farwell, Tex. H. V. MacGregor and his wife, Mary A. MacGregor, of Mason City, Iowa, who are the parents of the plaintiff, became the owners of the land in question in March, 1914. On August 14, 1936, these parents attempted to deed the land to the plaintiff, but due to a defective acknowledgement executed a correction deed of the date of November 15, 1936. The plaintiff filed this suit against the defendant December 23, 1936. The defendants answered by a general demurrer, general denial, and a plea of not guilty. By the testimony they asserted a lease or rental contract upon the premises from the original owners. This contract was based upon correspondence between the defendant Harrison and the MacGregors. It was agreed that any contract or correspondence had

with the record owners would be binding upon all parties..

Since the whole controversy is based upon communications between Harrison and the MacGregors, we deem it necessary to quote some. of the communications and parts of others, as follows:

"Mason City, Iowa, May 7th, 1936
"Security State Bank,
"Farwell, Texas,
"Will you make straight loan two thousand dollars three years interest rate all of section twenty eight block 8 recorded in court house at Farwell answer collect.
"Dr. H. V. and M. A. McGregor."

"May 13, 1936
"Dr. H. V. and M. A. McGregor
"Mason City, Iowa
"Gentlemen: I have just been out to see the land you described in your telegram for a loan of $2,000.00 (Section 28 Block 8).

"I would make the loan at eight percent interest per annum for three years providing that the land is farmed and kept in good condition.

"At present the land is very badly blown, and there are sand dunes up to three feet all over it, and in three years the land would be worthless if it were not farmed properly. To protect us both, I would want to have your authority to get the proper tenants to farm the land. This would give you an income and also protect the land from blowing.

"Since the land is so badly blown, it will take considerable time and money to get it back in shape to raise a crop. I don't know of any good tenant that would get it back in shape for the usual rent. If you would waive the first year's rent, I might be able to get a tenant to get the land back into shape. After that the land might give you some income.

"The authority for renting mentioned in paragraph three would of course be for the life of the loan. I am sure that you can see that this is for your advantage as well as mine; for having an interest in it, I would not want to see the land blow away.

"Yours very sincerely,
"David Harrison."

"5—16—36
"Mr. David Harrison,
"Security State Bank,
"Farwell, Texas.
"Dear Sir: You— communication of the 13th at hand. To say I am glad to get it is putting it mildly. If I had written you my-

self it would of been very nearly in your own words as to Your getting a renter that would suit both of us, and to have the land properly farmed. Then too, I had your interest included. We want to keep the land. The way you suggest we can. It was given to us by my wifes Father. By the way M. A. MacGregor is Mrs. H. V. MacGregor. She told me to Please say to you not to allow any one connected with the Jersig tribe to have one thing to do with this. You no doubt know we lost 4 years by them. We will gladly allow this year to get the land in condition. We hope it can be made to sow this fall, and perhaps get a row crop even if a bit late. We will allow you to make any arrangement that will be favorable to All parties conserned. Then to— when the land is right we can go on and make further arrangements. If we can have Cash rent being nonresident it would help us too as we are ageing and need a bit of help. If not all cash part and grain rent. I feel certain that you have all of our interests at heart and we will allow you to go on and make the arrangement. When you have write us and tell what we must do to carry out the arrangement and get the loan. Your arrangement is all right and fair for all parties. Thanking you and trusting we have an early reply, I am
"Very truly
"Dr. H. V. MacGregor."

"May 19, 1936
"Dr. H. V. McGregor
"504 First National Bank Building
"Mason City, Iowa.
"Dear Dr. McGregor, I have your letter of May 16, 1936, and am glad that you think it best that I get the renter for the land.

"Since the land is so badly blown, I don't see how it can be levelled and prepared for a row crop this fall. With the land in good condition, it would be hard to plant a row crop now, because it is so late. I think, Dr. McGregor, that the best thing to do is to get someone to get the land in condition and plant a wheat crop this fall. This would mean that you could not get any rent until 1938. I realize that you would like to get something in the way of rent as soon as possible, but with the land blown as it is, I don't see how it is possible.

"I don't believe I told you in my other letter that this would be a personal loan. The loan is due a little to— far off to be a bank loan, but I am willing to take it as a personal loan. As you have surmised, I am connected with this bank.

"If you agree to this letter, please send me your abstract, and I will have my attorney bring it up to date and prepare the necessary papers. After that I will mail the papers to you for your execution. You can then draw a draft on me with the papers attached.

"Yours very sincerely,
                    "David Harrison."

                    "5—22—36

"Mr. David Harrison
"Farwell, Texas.

"Dear Mr. Harrison, Your letter dated the 19th at hand. paragraph two is all right. I mentioned the roe crop as here some drill in for late rough feed. Then knowing it might take all of the time with other work the man you get could not do that. Let us hope he gets ready for fall sowing of wheat.

"It did give us a bit of heart failure to know we could not get anything from the land untill 1938 haveing had nothing from the land for four years, yet we have kept it free from debt, taxes paid and done our part.

"You did not say anything about the rent problem after the land was in production. I did say you might get cash or part cash and grain. We being nonresident would like the cash. However that can be arranged.

"I did have a feeling that the loan was Personal, now that you have verified it it will be O. K. I thank you for your interest. Now as the matter stands. We will not get any thing until 1938. Would you be willing to make the loan $2,500.00 and five years. * * *

"Very truly,
                    "Dr. H. V. MacGregor."

                    "May 27, 1936

"Dr. H. V. McGregor
"Mason City, Iowa

"Dear Dr. McGregor, I have your letter of the 22nd and am sorry that I didn't say anything about the rent you would get after the land is in production. The usual rent here is one-fourth of the crop delivered to the elevator. That means of course that you can get cash just as soon as the crop is hauled in.

"I don't believe, Dr. McGregor, that I would want to make the loan for $2,500.00 at the present. The land looks pretty bad right now, however when the land is back in production and if conditions look good, I might consider it. We have just had some good rains, and should give a good season for a while.

"I have already given you the arrangements for getting the loan, so if you agree to my letters, you can send me your abstract for my attorney to bring it up to date and make our the papers for your execution.

"Yours very sincerely
                    "David Harrison."

                    "5—29—36

"Mr. David Harrison
"Farwell, Texas

"Dear Friend: Your letter date the 19th at hand. I am sending the abstract with this mail. The last Paragraph in your meets with our approval. You will take care of the papers and return the papers for our signatures. * * *

"Very truly.
                    "Dr. H. V. MacGregor."

                    "July 25, 1936

"Mr. Davidson Henderson,
"C/r Security State Bank.
"Farwell, Texas.

"Dear Mr. Henderson: Your attorney reported to some defects in connection with the title to the property you were proposing to make a loan on, and I assume from his lates— letter that the loan did not go through because we could not locate some of the pepers he called for.

"With that in mind I had tentavely made other arrangements, and had my attorney write for the abstract.

"We wish to let you know, taking everything into consideration, we have definitely decided not to make a loan on our land. The length of time before we recive any income from it, and the high rate of interest on the loan would be an utter imposibility for us to meet.

"We would greatly appreciate it if you would send our Abstract along with your bill for services rendered. In that way close the transaction. Thanking you for your interest. I am

"Very truly,
                    "H. V. MacGregor."

                    "July 18, 1936

"Dr. H. V. McGregor
"504 First National Bank Building
"Mason City, Iowa.

"Dear Dr. McGregor, My attorney, Mr. Aldridge, said that he mailed you the papers to complete the loan about July

9, 1936 but neither of us have heard from you.

"I am very sorry that it has taken this long to get things straightened out, but you can see my position in wanting the title O. K. * * *

"I'm very sorry that it has taken so long, and I hope that we can soon complete the loan. It is very dry here now, and we need a rain badly but I guess that we are really better off than in some places.

"Yours very sincerely,

"David Harrison."

"September 9, 1936

"Mr. David Harrison,

"Security State Bank, Farwell, Texas.

"Dear Sir: Replying to your letter of August 31, to my father. The folks have deeded me this land and it is now in my possession.

"They wrote you definitely that they did not care to make the loan and that closes the matter.

"If a crop would yield no return for the first year it seems strange to me that you seem so anxious to get the land in shape for a crop.

"I am

"Yours very truly,

"Paul MacGregor."

After the defendant Harrison received the abstract from the MacGregors, and had the same examined by his attorney, he procured the other defendants to farm the land involved. The defendant Carr agreed that he would farm the south one-half of the section; that is, he would pull down the sand dunes and plant wheat in the fall of 1936. Harrison and one G. D. Anderson, who was also an official of the Security State Bank of Farwell, were to furnish all the seed wheat to sow the south one-half and were to bear one-half of the expenses of harvesting said wheat in 1937. Carr was to furnish all the labor and was to receive one-half of the wheat crop. Harrison and Anderson were to receive the other half of the wheat crop. The defendants Norton and Parker agreed to farm the north one-half of the section. They agreed to plant 100 acres of the north one-half in sudan for Harrison and the balance of the north one-half in wheat for themselves. They were to have no interest in the sudan, and Harrison was to have no interest in the wheat on the north one-half of the section. These farming operations began in June, 1936.

On June 10, 1936, Harrison made application to the United States government for compensation for the 100 acres of sudan under the Soil Conservation Program. In his application or "work sheet," he represented himself as the tenant of the whole section of land involved, and that he was paying a cash rental for said land. By a compliance with the requirements of the government, the testimony shows that Harrison would have received a cash payment of about $750 under this program by reason of sowing the 100 acres in sudan. At the time the plaintiff purchased the land, the defendants Norton and Parker had planted the sudan for Harrison.

Upon the receipt of the letter from the plaintiff of the date of September 9th, Harrison wrote the plaintiff a letter dated September 16th, informing the plaintiff of the arrangements he had made with the other defendants. At this time, the wheat, or at least a part of it, had already been planted. In this letter Harrison offered the plaintiff the privilege of taking over the contract if the plaintiff would pay him $240.87, the expenses Harrison alleged he had incurred in the transaction. Whether or not this offer included the wheat land of the other tenants is not clear from the letter. No mention was made by Harrison in this letter of the probable income from the planting of sudan. Harrison admitted that he never had mentioned this matter to any of the MacGregors. In response to Harrison's letter, the plaintiff wrote Harrison on September 21st denying Harrison's authority to make any contracts concerning the land, and asked him to vacate the same and have nothing more to do with the land.

This cause was tried before a jury, but at the conclusion of the evidence the trial court instructed a verdict for the plaintiff and against the defendants, and rendered judgment accordingly. This judgment, which was dated January 22, 1937, gave the plaintiff the title and possession to all the land involved. From this judgment, the defendants have appealed to this court.

■ Although the defendants have not raised the issue, we think the record in this case reveals fundamental error by the nonjoinder of a necessary party. It is uncontroverted that one G. D. Anderson was interested in the wheat on the south one-half of the section of land. The defendant Harrison testified that he and Anderson agreed to furnish the seed for sowing the wheat, and that Carr was to have

one-half of the wheat and Harrison and Anderson were to have the other half. Anderson then had a direct claim and interest in part of the subject-matter of this suit. A valid judgment could not be rendered in this cause without his presence. In 32 Tex.Jur. 13, par. 9, it is said: "All persons who have or claim a direct interest in the object and subject matter of the suit, and whose interests will necessarily be affected by any judgment that may be rendered therein, are not only proper but are necessary or indispensable parties plaintiff or defendant. As otherwise defined, a necessary party is one who is so vitally interested in the object or subject matter of the suit that a valid judgment cannot be rendered without his presence."

Again in 32 Tex.Jur. 128, 129, par. 88, we find the following language:

"Nonjoinder of parties necessary to a determination of the main issue is fundamental and requires either a dismissal of the suit or a stay of proceedings until they can be brought in. The court is without authority to pass on the merits or to decide any question which may affect the rights of such necessary parties. It matters not when or how the absence of such parties becomes apparent. * * *

"As is observed elsewhere, want of necessary parties is fundamental and will be noticed by the appellate court, even in the absence of an assignment of error."

Numerous authorities are cited by the text-writer in connection with the above quotations and in support of this proposition. After the introduction of the testimony showing that Anderson had an interest in the subject-matter, he should have been immediately made a party or the cause continued until he could be made a party. Such error being fundamental, this cause must be reversed.

In view of another trial we shall discuss some of the assignments of the defendant. From the briefs of the parties in this case, we assume that the trial court based his judgment on the theory that the defendant Harrison was unfaithful to his principal in making the contract herein involved. The vice of the situation seems to be that the defendant Harrison was the principal beneficiary, though acting as an agent of the MacGregors and, therefore, the whole transaction was voidable at the option of the plaintiff.

We think it is evident that the defendant Harrison became some sort of an agent of the MacGregors, and that he had the authority to make some sort of an arrangement in connection with the renting of the land in question for the years 1936 and 1937. At least, the correspondence gave him the authority to prepare the land in 1936 to make it suitable for a crop in 1937. Whether or not he had the authority to make the contract he did make and acted in good faith in so doing, we think became a question of fact which should have been passed upon by a jury. It is apparent from the record that the MacGregors, according to the contract, had no idea of collecting any rent in 1936 or 1937. In one of the first letters to Harrison, Dr. MacGregor said: "We will gladly allow this year to get the land in condition. We hope it can be made to sow this fall, and perhaps get a row crop even if a bit late. We will allow you to make any arrangement that will be favorable to all parties concerned."

Just what he meant by "any arrangement" we do not know, but a jury might have found that this language, or some similar language in the letters, gave the defendant Harrison the authority to make the very contract he did make. We are aware of the rule that an agent must act with the utmost good faith and loyalty to further the interest of his principal, and such loyalty requires that an agent must not enter into a transaction concerning the subject-matter of the agency in which he has an individual interest or interests adverse to those of his principal, but such a rule does not apply if the principal consented to such a contract or authorized its making. The question naturally follows as to whether or not the defendant Harrison was given such authority by the MacGregors. We think such question is a fact issue that should have been determined by the jury.

There is another very serious question assigned as error in this case. That question involves the court's action with reference to denying the defendants Carr, Norton, and Parker any relief as against the plaintiff. Although they filed only a plea of not guilty of the trespass alleged against them, under such a plea they would be entitled to assert any rights which would defeat the recovery of possession by the plaintiff of the wheat then growing on said section. These defendants, from their own testimony, were innocent third parties who dealt with an

agent of the MacGregors without knowledge of his alleged lack of authority or of his alleged bad faith. The plaintiff does not charge these defendants with bad faith, and the record does not reveal any bad faith on their part. From an agreement with the agent of the MacGregors they entered the premises and restored the land to a state of cultivation. Thereafter, in good faith, they planted the land in wheat. The plaintiff, by obtaining possession of the premises by the judgment in January, 1937, if such judgment is undisturbed, will reap the benefits of the labors of these innocent third parties and give nothing therefor in return. We do not think these defendants, under the facts in this case, can be charged with any wrong complained of with respect to the defendant Harrison. At least, they could not be so charged unless it was found that they were in collusion with Harrison to perpetrate a fraud upon the plaintiff. Such collusion could only have been established in this case by a finding of the jury. If Harrison had the authority to rent the land to these defendants, they were not trespassers, but tenants of the plaintiff. On the question of innocent third parties dealing with an unfaithful agent, in 3 C. J.S., Agency, p. 185, we find this language: "On the other hand, it is to be borne in mind that it has been the tendency of courts to protect those dealing in good faith with an unfaithful agent, who, authorized to handle the property of his principal, has misapplied it, where it appears that the agent has the actual power to perform the act, not for his own, but for the principal's benefit. Accordingly, where the third party acted in good faith and with no notice of the fact that the agent was acting for his own benefit, the principal cannot avoid liability on contracts made with the agent's authority."

This same doctrine was announced by our Supreme Court in the early case of Wright v. Calhoun et al., 19 Tex. 412, on page 421, wherein that court says: "Nothing is better settled, than that the fraud of an authorized agent will invalidate a contract entered into by him, in behalf of his principal. It is a general doctrine of law (says Judge Story), that the principal 'is held liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances, and omissions of duty of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies, respondeat superior.' (Story Agency, Sec. 452.) There can be no sounder doctrine of morals or of law, than that which forbids the principal to take a benefit from the fraudulent act or contract of his agent, to the injury of an innocent third person. It would indeed be a monstrous doctrine, to hold that a principal may speculate upon and enjoy the fruits of the frauds of his authorized agent, and incur no responsibility to the injured parties. It would enable one man, by employing the instrumentality of an unprincipled agent, to cheat, defraud and swindle others out of their property, and turn them over to their recourse upon the worthless agent, while he, the principal, received and retained the fruits of the iniquitous bargains. Such a doctrine can have no sanction in morals or law."

This same rule has been followed many times. See Wardlaw v. Pace et al., Tex. Civ.App., 66 S.W.2d 350; W. C. Biggers & Co. v. First Nat. Bank of Kaufman, Tex.Civ.App., 29 S.W.2d 841; Sargent et al. v. Barnes, Tex.Civ.App., 159 S.W. 366; Foix v. Moeller et al., Tex.Civ.App., 159 S.W. 1048.

In view of the above rule, before the trial court would be authorized to ignore the rights of these alleged innocent defendants, we think it was incumbent upon him to submit appropriate issues to the jury to determine the question of good faith on the part of the defendants Carr, Norton, and Parker. If they acted in good faith and without knowledge of the purported fraud upon the plaintiff, it is our opinion that the plaintiff is bound by the contract as far as these defendants are concerned, provided it is first determined that the defendant Harrison had authority to make the arrangements with these defendants that he did make. In no event could these innocent third parties be charged with the fraudulent acts of Harrison unless they were in collusion with him. We think these issues should have been submitted to the jury and that the court erred in not doing so.

The judgment is reversed, and the cause remanded.