**BANKERS LIFE INSURANCE COMPANY OF NEBRASKA, Plaintiff-Appellee,**

v.

**SCURLOCK OIL COMPANY, Defendant-Appellant.**

**No. 30498.**

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1971.

Rehearing Denied Oct. 28, 1971.

———◆———

Wm. E. Junel, M. W. Parse, Jr., Stephen D. Susman, Newton Gresham, Houston, Tex., for defendant-appellant; Fulbright, Crooker, Freeman, Bates & Jaworski, Sewell, Junell & Riggs, Houston, Tex., of counsel.

Pat S. Holloway, Dallas, Tex., for plaintiff-appellee.

Before O'SULLIVAN,* THORNBERRY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge.

In this Texas diversity case, Scurlock Oil Company [hereinafter referred to as Scurlock], a pipeline purchaser, appeals from the judgment of the court below holding Scurlock liable for (1) breach of contract with respect to, and (2) conversion of, certain oil belonging to the Bankers Life Insurance Company of Nebraska [hereinafter referred to as Bankers]. The facts are complicated, but they may be abbreviated at this point to facilitate delineation of the major questions in the case.

Bankers owned a mortgage on certain oil leases in East Texas and was entitled to receive the oil runs from these leases. Bankers' mortgagor was a man named Jordan, who previously had owned and operated the leases, and whom Bankers contracted with to continue operating the leases in Bankers' behalf. As a pipeline purchaser, Scurlock purchased oil from Jordan at Jordan's storage tanks. Scurlock was under contract to pay Jordan for some of the oil, for which Jordan would then account to Bankers, and to pay Bankers directly for the rest. When Jordan delivered the oil in question in this case to Scurlock, however, he represented that it was oil for which Scurlock

* Senior Circuit Judge, 6th Circuit, sitting by designation.

should pay him rather than Bankers, when in actuality it was oil for which Bankers should have been paid directly. Relying on Jordan's misrepresentations, Scurlock paid Jordan rather than Bankers. Jordan never accounted to Bankers for the oil payments it received. Bankers sued Scurlock for breach of contract and conversion. The district court found Scurlock liable under both theories of recovery. We find Scurlock liable under neither, and reverse.

## I. FACTS

Scurlock is in the business of purchasing crude oil from lease operators and others for resale. Scurlock collects this crude oil through its gathering systems, which usually consist of a pumping station and a pipeline. Oil is pumped into Scurlock's pipeline from storage tanks, into which the oil is run from individual leases. The storage tanks usually belong to the operators of the leases. The operator runs the oil from the leases he is operating into the tanks either through underground pipes connected directly with the tanks, or aboard trucks.

In the early part of 1960, Scurlock, in connection with its pipeline purchasing business, acquired a gathering system in an East Texas Oil Field. This system included a pumping station. On the grounds of the pumping station were located four storage tanks, identified as the Kangerga South Tank Battery. These tanks were the storage tanks for oil produced from a number of leases identified as the Southend Leases. Oil produced from these leases was delivered to the tanks in trucks. The oil was then pumped through Scurlock's pumping station into Scurlock's pipeline. Prior to 1963, Scurlock was purchasing oil at the Kangerga South Tanks from the then operator of the Southend Leases, Stroud Brothers. In 1963, however, the aforementioned Jordan acquired Stroud Brothers' interest in the Southend Leases, and replaced Stroud Brothers as the operator of the Southend Leases. Wishing to continue purchasing oil from the Southend Leases, Scurlock on January 4, 1963 executed Division Order No. 60424, agreeing to pay Jordan for all the oil received under that division order.

Later, in the mid-1960's, Scurlock acquired another gathering system in the East Texas Field from the Ashland Oil and Refining Company. This gathering system included a pumping station located approximately twenty-two miles north of the Kangerga South Battery. The Ashland pumping station gathered oil from a number of nearby tank batteries, including a battery of four tanks known as the A. L. Still Tank Battery. The A. L. Still Battery was connected by underground pipe to nineteen wells located on the A. L. Still Lease, and oil produced from these wells was run directly into the tanks by underground pipe, and then pumped from the tanks into Scurlock's gathering system. When Scurlock acquired the Ashland gathering system, the A. L. Still Lease, and the tanks connected to it, were owned and operated by the same Jordan who had purchased the Southend Leases. Scurlock therefore contracted with Jordan pursuant to another Division Order, No. 13602, to purchase oil received under that order from the Still Tank Battery pursuant to Jordan's interest in the Still Lease.

About 300 yards from the Still Tank Battery were located two other tanks, known as the Kangerga North Tanks. These tanks were connected to Scurlock's Ashland pumping station by a gathering line, but like the Kangerga South Tanks they were not connected to any specific leases by underground pipe. Instead, oil was trucked to these tanks as it was to the Kangerga South Tanks. The Record does not reveal who owned the Kangerga North Tanks, but Scurlock did purchase oil from them and paid Jordan for that oil under its Division Order No. 60424, which also covered the Kangerga South Tanks.[1]

---

1. Division Order No. 60424 by its terms covered only the Southend Leases, and

when Scurlock began purchasing oil from the Kangerga North Tanks in 1965, it did

This course of dealing between Scurlock and Jordan—purchasing oil from the Kangerga South and North Tanks under Division Order No. 60424, and oil from the Still Tanks under Division Order No. 13602—continued until May 31, 1968. At that time, Jordan secured a loan from Bankers, in exchange for which Bankers took a mortgage on numerous of Jordan's leasehold interests, including Jordan's interest in the Southend Leases and Jordan's interest in the A. L. Still Leases. The mortgage entitled Bankers to all the runs to which Jordan was entitled from the mortgaged leases. Jordan was, however, to continue operating the leases, and delivering the oil from them to Scurlock for sale.

As a result of Bankers' acquisition of an interest in these leases, it became necessary for Scurlock to change its Division Orders covering the mortgaged leases. Since all the runs under Division Order No. 13602 (covering the A. L. Still Lease) would now be credited to Bankers, Scurlock executed a Corrected Division Order No. 13602, which directed that Jordan's interest in the runs under the original Division Order No. 13602 be paid directly to Bankers[2] under the same terms and conditions as set out in the original Division Order. Since not all the runs under Division Order No. 60424 were mortgaged to Bankers, however, Scurlock, with Bankers' agreement, continued to pay Jordan directly for the runs Scurlock purchased under that Division Order, which left Jordan with the obligation to account to Bankers for the payments he received thereunder.

From May 1, 1966, through September 30, 1967, Scurlock continued to buy oil from the A. L. Still Tanks, and from the Kangerga North and South Tanks. Pursuant to its Corrected Division Order No. 13602 it paid Bankers directly for all the oil it purchased from the A. L. Still tanks, and it continued to pay Jordan for all the oil it purchased from the Kangerga North and South tanks. It was during this period that Jordan's undisputed fraud took place.

The trial court found, and Scurlock does not dispute this finding, that Jordan somehow (although there is no finding as to exactly how)[3] transferred 85,000 barrels of oil from the A. L. Still Tanks (runs from which should have been credited directly to Bankers) to the Kangerga North Tanks, a few hundred yards away from the Still Tanks. The upshot was that Scurlock paid Jordan for 85,000 barrels of oil it pumped from the Kangerga North Tanks under Division Order No. 60424, when that oil should have come from the Still Tanks and been credited to Bankers' account under Division Order No. 13602. Although Jordan was obligated to account to Bankers for payments he received under Division Order No. 60424, he never did so.

In order to understand how Jordan could have effected his fraudulent scheme, we need at this point to review the mechanics of pipeline purchasing as it is described in the Record. As we indicated earlier, oil from the leases is delivered to the storage tanks, from whence the pipeline purchaser pumps it. The storage tanks may be connected directly to the leases by underground pipes; this was the case with the A. L. Still Tanks. When there is no underground connection between the lease and the tanks, however, oil must be transported to the tanks by truck; this was the case with Kangerga North and South Tanks.

The storage tanks into which the oil is delivered are normally owned by the operators of the leases from which the oil comes. As long as the oil remains in the

---

so under Division Order No. 60424, assuming, as apparently was the case, that the oil did come from the Southend Leases. *See also* note 8 *infra.*

2. The agreement actually directed that Jordan's interest in the A. L. Still Lease be paid to Oliver & West, Inc., Bankers'

agent for collection. To simplify matters, however, we have named Bankers as the recipient of the proceeds throughout this opinion. *See also* text accompanying note 11 *infra.*

3. *See* text accompanying note 7 *infra.*

storage tanks, it belongs to the owner of the leases. The pipeline purchaser takes no title in, and incurs no liability for, the oil in the tanks until it pumps that oil from the tanks into its gathering lines. Nor does the pipeline purchaser have any way of knowing where the oil in the tanks has come from. The operator has complete control over and responsibility for delivering the oil from the well-site to the storage tank.

Once the operator has delivered the oil from the lease to the tanks, the pipeline purchaser may pump it into its pipeline. The actual pumping operation is performed at the direction of a "gauger" who is employed by the pipeline purchaser to gauge the amount of oil delivered into the pipeline. For each delivery, the gauger fills out a "run ticket" showing (1) the height of the oil in the tank before and after it has been emptied, (2) the number of the tank, (3) the Division Order number assigned to the tank; and (4) the numbers of oil and new "seals" on the tanks.[4] The gauger then sends the run tickets to the pipeline purchaser's home office where the measurement of the height of the oil in the tanks is converted to barrels and payment is made for such oil to the interest owners listed on the Division Order designated by number on the run ticket.

According to the Record, the run tickets are the sole basis upon which the pipeline purchaser makes payment to the interest owners. It is thus evident that the procedure for taking delivery of oil

from a storage tank into a pipeline requires the pipeline purchaser to rely heavily upon its gauger to fill out the run slip correctly.[5] In addition, the pipeline purchaser must rely on the operator to deliver into the storage tanks oil from leases which are covered by the division orders assigned to the tanks.

The evidence produced in the trial below suggests several possible ways in which Jordan might have effected the transfer of Still Lease oil to the Kangerga North Tanks. One possible method would have been for Jordan, through the use of undisclosed underground connections, to feed the oil from the Still Tanks into the Kangerga North Tanks. Another possible method would have been for Jordan to manipulate Scurlock's gathering lines and the seals on the Kangerga Tanks in such a way as to cause the oil from the Still Tanks to back into the Kangerga North Tanks as it was being pumped into Scurlock's gathering lines through Scurlock's pumping station.[6] A third way would have been for Jordan to enlist the cooperation of one of Scurlock's gaugers to falsify the run tickets from the Still Tanks by entering Division Order No. 13602 instead of Division Order No. 60640 on the tickets.[7]

The trial court made no fact finding which settled upon the use of any one of these methods by Jordan, however. The only fact finding made was that the oil purchased by Scurlock and charged to the Kangerga North Tanks in fact "came from four good wells on the south

---

4. "Seals" were placed on the tanks as safety devices to protect the pipeline company from oil losses by preventing oil that was being pumped from one tank from "backing into" the line of another tank. Each time a gauger delivers oil from a tank into the pipeline, he must break the old seal on the tank, and when the delivery is over he seals the tank with a new seal.

5. The pipeline purchaser, of course, has certain precautionary measures it may take to see that no oil has been run without filling out a run ticket, or that no run ticket has been misplaced. The main method used by the pipeline purchaser to keep tabs is to spot check the run

tickets to ascertain whether the seal numbers correspond to the high variations in the tanks. See note 4 supra.

6. See note 4 infra.

7. There is evidence in the Record that one of Scurlock's gaugers, a man named Shamburger, was receiving a monthly salary from Jordan during the period in question in this case for doing mechanical work for Jordan on nights and weekends. There is no evidence, however, and the trial court made no fact finding that Shamburger falsified run tickets for Jordan, or that Shamburger was in cahoots with Jordan in his scheme to defraud Bankers.

end of the A. L. Still Lease." For purposes of reviewing this case, therefore, we cannot assume that Jordan used any one of the above methods to effect his fraudulent scheme. We must base our opinion on what we know; and we know, because it is undisputed, that Jordan was chiefly responsible for perpetrating this fraud upon both Bankers and Scurlock.[8]

## II. BREACH OF CONTRACT

Having concluded that Scurlock had paid the proceeds credited to the Kangerga North Tanks to Jordan when those proceeds should have gone directly to Bankers, the trial court concluded first that Scurlock was liable to Bankers for breach of contract. The contract between Scurlock and Bankers was the Corrected Division Order No. 13602, and the trial court concluded that this division order "was binding on Scurlock to pay all the proceeds of the oil from the A. L. Still Lease to Bankers."

█ It is settled law in Texas that a division order constitutes a contract between the interest owners and the pipeline purchaser. Pan American Petroleum Corp. v. Long, 5th Cir. 1964, 340 F. 2d 211; LeCuno Oil Co. v. Smith, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n. r. e.), cert. denied, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958); Chicago Corp. v. Wall, 156 Tex. 217, 293 S.W.2d 844 (1956). Thus,

if this division order provided what the trial court held it provided, Scurlock was bound to pay Bankers for all the proceeds of the oil from the Still Lease. Scurlock argues, however, that the trial court erred in its construction of the division order. It argues that its only obligation under the Corrected Division Order No. 13602 was to pay Bankers for *oil received under that Division Order,* and not for oil produced from the A. L. Still Lease, or even for oil produced and delivered to Scurlock from the A. L. Still Lease.

The language of Division Order No. 13602 provides in pertinent part as follows:

1. The oil run hereunder shall become the property of the Scurlock Oil Company * * * and * * good title to same shall pass to it as soon as the same is received and delivered to any pipelines or other conveyances designated by the Scurlock Oil Company.

2. The oil received under this division order shall be paid for by the purchaser (Scurlock Oil Company) to the party or parties entitled thereto according to the division of interests shown above.

█ It is clear to us that the language of this Division Order binds Scurlock to pay for neither all the oil produced from the A. L. Still Lease nor all the oil produced and delivered to Scurlock from the

---

8. Jordan's fraud extended beyond a mere scheme to steal oil from his mortgagee. For while operating the A. L. Still Lease, Jordan produced 85,000 barrels in excess of the Texas oil allowables for the Still Lease, set by the Texas Railroad Commission. Oil produced in excess of Railroad Commission allowables is known as "hot oil." Jordan's scheme to sell his "hot oil" from the Kangerga North Tanks instead of the Still Tanks thus not only effected his theft from Bankers, but also enabled him to avoid detection by the Railroad Commission since the A. L. Still Tanks had already delivered their maximum allowables for the periods in question in this case. The oil which Jordan sold from the Kangerga North Tanks also had to be explained to the

Railroad Commission, however, for Jordan was required to report all production and sales to the Commission. He therefore filed reports with the Commission stating that some 145,000 barrels of oil had been received by him at the Kangerga North Tanks. Of this amount, he reported that 85,000 barrels had been transported by truck from the Converse Field in Louisiana, and 55,000 by truck from the Southend Leases. Scurlock paid Jordan for all 145,000 barrels under Division Order No. 60424, but Jordan accounted to Bankers for only the 55,000 barrels that came from the Southend Leases. The 85,000 barrels reported to have come from Louisiana was, of course, the "hot oil" from the A. L. Still Lease.

A. L. Still Lease, but only for the oil Scurlock receives from the A. L. Still Lease *under that Division Order.* And it is undisputed that all the oil which Scurlock has received from the A. L. Still Lease under Division Order No. 13602 has been paid for by Scurlock directly to Bankers, in complete compliance with its contractual obligations.

We think this construction of the Division Order comports not only with the literal wording of the Order itself, but also with the practices of the oil industry as they are described to us by the Record in this case. In the first place, it is apparent to us that the division order under which a pipeline purchaser buys oil is a singularly significant instrument in the pipeline purchasing business. It is uncontradicted that when a pipeline purchaser pumps oil from a Tank to which a particular division order number is assigned, the pipeline purchaser has no way of knowing (other than to rely on the division order) where that oil came from. Thus, if oil is pumped from a particular tank to which a particular division order number has been assigned, that fact, and that fact alone, signifies that payment must be made in accordance with the particular division order. The pipeline purchaser must therefore rely on the operator to run the right oil into the right tank, and on its own gauger to enter the correct division order number on the run tickets. In light of these practices, it is quite understandable that the pipeline purchaser would obligate itself to pay for no more than the oil it receives under the particular division order.[9] Under any other construction of this division order, the pipeline purchaser could be liable for oil production from a particular lease which has been delivered to it at another location and for which it conceivably may have paid under another division order.

Bankers argued that if we sustain Scurlock's profferred construction of its division order, "the oil industry could literally be reduced to chaos and shambles" because of the power such a construction would place in the hands of the pipeline purchaser's gauger. According to Bankers, gaugers, who have the job of gauging the tanks and filling out the run tickets, which includes placing the division order number on the run ticket, would "become the absolute czars of the oil industry with the power to create and destroy fortunes with the stroke of a pencil."

It is, of course, true that the gauger has a very responsible job. But the *possibility* that a gauger would commit a dishonest act in performing his job has nothing whatever to do with construing the language of this division order. Our construction does not mean that if in any particular case it is *established* that the pipeline purchaser's gauger falsified a run ticket, the pipeline purchaser would be immune from liability. It goes without saying that the pipeline purchaser could be held to answer under a number of theories for the acts of the gauger, including, possibly, breach of contract on the theory that the pipeline purchaser would be charged with its gauger's knowledge that the oil being delivered was run under a division order other than the one entered on the run slip. It is not necessary for us to expound upon those possibilities now, however, for this is *not* a case in which it has been established that a pipeline purchaser's gauger falsified a run ticket.[10] We must decide this case on the facts as they are presented to us.

### III. CONVERSION

Even if Scurlock is not liable for breach of its contract with Bankers, however, it might still be liable for conver-

9. This, of course, does not mean that different wording in a division order would not produce a different result. All that we hold here is that the language of Division Order No. 13602 binds Scurlock to pay for no more than the oil runs received under that Division Order. As Scurlock points out, the parties may provide for a different result simply by wording their contract differently.

10. *See* note 7 *supra* & accompanying text.

**1004**

sion of Bankers' oil. The district court held that it was.

■ Conversion is defined as the unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner. Pan American Petroleum Corp. v. Long, *supra*, 340 F.2d at 219–220. Scurlock, of course, admits that it received Bankers' oil from Jordan, and that it paid Jordan therefor when it should have paid the proceeds directly to Bankers. Scurlock argues, however, that its payments to Jordan constituted payment to Bankers because Jordan, as Bankers' mortgagor and the operator of Bankers' leases, was Bankers' agent.

■ In Texas, the law of conversion in a case of this type is that one may convert a chattel by receiving it pursuant to a transfer made without authority. Kimbell Milling Co. v. Greene, 162 S.W. 2d 991 (Tex.Civ.App.—Fort Worth 1942), aff'd, 141 Tex. 84, 170 S.W.2d 191 (1943). The critical question on Scurlock's liability for conversion therefore, is whether Scurlock received this oil pursuant to a transfer made without "authority."

It is clear from the terms of Bankers' mortgage agreement with Jordan that Jordan possessed all the power and authority of an operator over Bankers' leases to produce, deliver, and sell production, and to receive the proceeds from such sales, with the duty to account to Bankers therefor. The mortgage agreement provided as follows:

> Mortgagors will, except to the extent otherwise recommended by Assignee,

continuously produce all of the wells located upon any of the lands described in Exhibit A at the highest allowable rate legally permissible, subject only to the physical capacity of the wells; Mortgagors will deliver all of such production to a purchaser thereof, will cause all of such production to be sold at not less than the current market price therefor, and will cause to be paid to Assignee for the benefit of Noteholder all of the proceeds of the sale of such production as herein provided.[11]

Bankers does not dispute that Jordan was its agent for purposes of operating its leases in a lawful manner. Bankers argues, however, that the particular transfers which took place in this case were transfers outside the scope of Jordan's authority, and thus not chargeable to Bankers as Jordan's principal. We do not agree.

■■ First, we think it is important to focus on exactly what authority Jordan possessed and what acts he committed. Jordan had authority to pump oil from the Still Lease and to deliver that oil to Scurlock, and to cause Scurlock to pay Bankers directly for that oil. Jordan also had authority to pump oil from the Southend Leases, to deliver that oil to Scurlock, and to receive payment therefor in Bankers' behalf. Jordan pumped oil from the Still Lease, which he was authorized to do;[12] he delivered that oil to Scurlock, which he also authorized to do; but he fraudulently represented to Scurlock that this was oil for which Scurlock should not pay Bankers directly, but should pay Jordan. In other words, Jordan, who was undisputedly

11. The Assignee under the agreement was Oliver & West, Inc., Bankers' agent for collection. "Noteholder" is Bankers. *See* note 2 *supra*.

12. Bankers has argued vigorously that Jordan did not have authority to pump "hot oil" from the Still Lease, *see* note 8 *supra*, and that therefore Jordan's actions fell outside the scope of his authority and as such are not chargeable to Bankers. The fact that the oil in question here was "hot

oil" is, however, irrelevant for the purposes of this case. The merits of this case would be exactly the same if, instead of "hot oil," this had simply been oil which Jordan had stolen from Bankers. This is not, in other words, a suit which seeks to hold anyone responsible for the production of "hot oil" as such, or to vindicate the Railroad Commission allowables in any way. If it were such a suit, the question of Bankers' liability for Jordan's ac-

Bankers' agent in delivering and selling this oil to Scurlock, committed fraud in delivery and the sale of the oil.

■ On these undisputed facts, this case falls squarely within a line of Texas cases which forbid a principal to benefit from the fraudulent acts of its agent to the detriment of third parties. This rule applies even though the principal had no knowledge of the fraud, did not consent to it, and indeed is a victim of the fraud himself. *See* W. C. Biggers & Co. v. First Nat'l Bank, 29 S.W.2d 841 (Tex.

Civ.App.—Texarkana 1930, writ dism'd). The *Biggers* problem was similar to the instant problem in a number of ways. There, an agent, who had been entrusted with the power to accept drafts for his principal, accepted a draft for the purpose of defrauding his principal. The principal argued that the agent was not acting within the authority conferred upon him when he accepted drafts drawn for the purpose of defrauding his principal, and thus the principal sought to avoid having to pay

tions would be viewed in a completely different light.

The distinction we make here is a well-established one—drawn between suits which seek to impute an agent's fraud or guilty intentions to his principal, and suits which seek to allocate the loss resulting from an agent's fraud between the principal and innocent third parties. Two considerations operate to create the distinction. The first is whether the action seeks to impute any evil intent to the principal in a way that would result in punitive consequences to the principal. When the action would have such consequences, then clearly, if the actions of the agent were unauthorized, committed without the principal's knowledge and for no benefit to the principal, the principal should not be held responsible. The types of cases in which we find this rule applied are usually criminal cases, or cases having some punitive consequences. *See* United States v. Ridglea State Bank, 5th Cir. 1966, 357 F.2d 495, 498–499. In most civil cases, however, where no punitive consequences are involved, the principal is held liable for the fraudulent misrepresentations of his agent, even though the agent acted without authority and without any intent to benefit his principal, so long as the third person reasonably believed the agent was acting within the scope of his authority. *See Ridglea State Bank, supra.* It is in these cases that the second consideration comes into play. And that consideration is to protect innocent third parties, or perhaps more accurately, to prevent principals from benefiting at the expense of innocent third parties.

An instructive example of the distinction between these two types of cases appears in Pan American Petroleum Corp. v. Long, 5th Cir. 1964, 340 F.2d 211, a case involving problems quite similar to those in the instant case. In *Long* the question

was whether a slanted-on company could recover from a financial institution (SWL) the proceeds of stolen oil received by SWL in payment of loans made to Long, SWL's slant-holing mortgagor and operator. There was a subsidiary question as to whether the fraud of the slant-holing operator which had caused the tolling of the statute of limitations on the slanted-on company's action against the operator could be imputed to SWL to cause the tolling of the statute of limitations against SWL as well. The Court held that SWL could be charged with Long's possession and disposition of the "hot oil." On this question, the Court stated the following:

Of course SWL never intended to get mixed up with stolen oil. But on the natural assumption that oil coming out of a well on a lease was oil coming *from* that lease, it is obvious that what SWL was really after was to secure its interest by getting its hands on the proceeds of whatever was produced on the Long lease. * * * It is perfectly understandable that SWL, a reputable institution, disclaims any purpose of intending to acquire an interest in oil owned, not by Long, but by others. But while preserving its honor and integrity as a proposition of initial intent, it does just that when it seeks to retain the benefits received directly from sales of stolen oil, made under its direction and control.

340 F.2d at 224.

Thus, the Court held SWL, the mortgagee, liable for the conversion of oil pumped and sold by its operator Long, the mortgagor. When it came to penalizing SWL for Long's fraud, however, by tolling the statute of limitations against SWL, the Court declined to impute Long's fraudulent intent to SWL because SWL had no knowledge legally or actually that it was receiving the fruits of stolen property from Long.

the drafts. Conceding that the agent was acting outside his authority, the court nevertheless held the principal liable. It stated the following rule: "When the innocent principal or an innocent third party must suffer loss from the misconduct of an agent acting within the apparent scope of his authority, as such, that the loss must be borne by the principal." 29 S.W.2d at 842.

The wisdom and fairness of this rule has been recognized in later Texas cases. *See* Harrison v. MacGregor, 112 S.W.2d 1095 (Tex.Civ.App.—Amarillo 1938, no writ), where the court stated the following:

There can be no sounder doctrine of morals or of law, than that which forbids the principal to take a benefit from a fraudulent act * * * of his agent, to the injury of an innocent third person. It would indeed be a monstrous doctrine, to hold that a principal may speculate upon and enjoy the fruits of the frauds of his authorized agent, and incur no responsibility to injured parties. It would enable one man, by employing the instrumentality of an unprincipled agent, to cheat, defraud, and swindle others out of their property, and turn them over to their recourse upon the worthless agent, while he, the principal, received and retained the fruits of the iniquitous bargains.

112 S.W.2d at 1100.

And in Wardlaw v. Pace, 66 S.W.2d 350 (Tex.Civ.App.—Eastland 1933, no writ), it was held that this rule cannot be avoided by arguing that the fraudulent representations were outside the scope of the agent's authority when the principal clearly had entrusted the agent with the power to make such representations. In *Wardlaw*, the court said:

[a] principal may become liable, by placing an agent in such a position, or by devolving certain duties, [upon him] that making representations will fall within the scope of his authority, as, for instance, where he is clothed with full power to sell or dispose of property, in which case the making of representations would be a usual, if not a necessary, incident. It may be conceded that the principal intended that the agent should only make truthful and fair representations; but a power to make representations would involve the power and possibility of the making of false and fraudulent ones, and, if he makes them, the principal will be responsible for them.

66 S.W.2d at 351.

■ The underlying purpose of the rule which binds the principal by the fraudulent acts of its agent in civil cases is obviously to impose liability where it may best be heeded. *See* United States v. Ridglea State Bank, 5th Cir. 1966, 357 F.2d 495, 499. Imposition of such liability on principals encourages them to be more careful in selecting their agents. Principals should not be able to turn frauds and cheats loose on the public and expect to be immune from the consequences of these agents' misdeeds. Indeed, the Record in this very case attests to the soundness of this policy. For it appears that when Bankers entered into this mortgage agreement with Jordan, it *knew* that Jordan had a reputation for dishonesty in the oil business, and was explicitly *advised* by counsel *against* having any dealings with Jordan. Bankers nevertheless decided to make the loan and to have Jordan continue operating the leases.[13]

13. Bankers apparently thought it could *protect itself* from any possibility of Jordan's fraud, for it took extraordinary steps to guard against Jordan's malfeasance. In its mortgage contract with Jordan, it reserved the right to inspect all Jordan's books and records, to receive and inspect all reports filed by Jordan with the Texas Railroad Commission, and finally it reserved the right to take over operation of the leases in the event Jordan failed to account to Bankers for payments he had received. In the end, Bankers invoked the last mentioned power, and took over complete operation of the leases after learning of Jordan's fraud.

■ A second reason for the rule that the principal must answer for its agents' fraud as against third parties is that the third party purchaser usually has no reason to expect the agent, who has been endowed with all the indicia of authority, to use that authority to commit fraud. Again, the facts of this case point up the soundness of the rule. Here, Scurlock, as the pipeline purchaser, was forced to rely on Jordan's good faith delivery of the right oil to the right tanks, for there was no other way in which Scurlock could ascertain the source of the oil. It was thus very important that the operator be honest and reliable. Yet Bankers chose for its operator a man whom it knew to be disreputable. It is hard to conceive of a stronger case than this for binding the principal by the acts of its agent.

The cases we have cited above arose in a situation in which the principal was sued to account for its agent's fraud. We think, however, that the policies so clearly enunciated in those cases apply with equal force, if not more, in the instant situation, where the principal is trying to make a third party pay twice for the fraud of its agent. There are several Texas cases in which a principal, seeking to recover from a third party purchaser who already had paid the principal's agent, was held estopped by the agent's actions. The same policies enunciated in the cases discussed above appear in these cases.

In Davis Motors, Inc. v. Peel, 354 S.W. 2d 408 (Tex.Civ.App.—Fort Worth 1962, no writ), an automobile sales company sued a buyer who had purchased a car from the company's sales agent. The agent had transferred title to the car, received payment for it, but failed to account to the company. The court held that when an automobile sales corpora-tion puts its sales agent in possession of an automobile and *places him in the position where he has access to its certificates of title*, it leads the buyer justifiably to believe that the sales agent has actual authority to transfer title to the automobile and to accept money in payment for it. *See also* Rose v. Zeigler Cattle Co., 450 S.W.2d 365 (Tex.Civ.App. —El Paso 1970, writ ref'd n. r. e).

■ The point of the *Davis* case, and of all the above-cited cases, we think, is that when a principal puts his agent in a position of responsibility and gives that agent certain powers to act in the principal's behalf, third parties are entitled to rely on an agent's good faith performance of his apparent powers. And if the agent uses those powers in a deceitful manner, it is not the innocent third party who should suffer, but the principal who inflicted the deceitful agent upon the public in the first place.

It is clear to us that the facts of this case call for application of this principle. Here, it was Bankers who decided to make Jordan its operator, it was Bankers who put Jordan in the position that enabled him to pump oil from the Still Lease and deliver it to the Kangerga South Tanks, and it was Bankers who entrusted Jordan with the power to represent to Scurlock, by delivering this oil to the wrong tanks, that the oil was something other than oil from the Still Lease.

It is therefore our opinion that the instant appeal is controlled by the above-cited cases and the policies underlying those cases. Accordingly, we must reverse the judgment of the court below,[14] and remand this case with directions to enter judgment for Scurlock.

Reversed and remanded with directions.

14. After it concluded that Scurlock was liable for breach of contract and conversion, the trial court awarded exemplary damages in Bankers' favor and against Scurlock. Since we have concluded that Scurlock was liable for neither breach of contract nor conversion, the trial court's award of exemplary damages must be reversed along with the judgment on the merits.