R. W. NORRIS, Jr., Plainitff-Appellee-Cross Appellant,

v.

BOVINA FEEDERS, INC., Defendant-Appellant-Cross Appellee.

No. 73–2125.

United States Court of Appeals, Fifth Circuit.

April 10, 1974.

A. W. SoRelle, III, H. A. Berry, Amarillo, Tex., Sam Aldridge, Farwell, Tex., for defendant-appellant.

Walter P. Wolfram, Carroll E. Brown, Amarillo, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

In this Texas diversity case, plaintiff R. W. Norris recovered, on jury findings, damages representing lost business profits for wrongful detention of an expensive and highly productive machine, a grain grinder capable of producing 100 tons of ground feed per hour. Nor-ris' judgment is attacked here by defendant Bovina Feeders, Inc. (Bovina), as awarding damages which are as a matter of law too speculative and uncertain to be proved to that degree of certainty which the law demands, as well as on other grounds. Though the appeal presents close questions, and though the evidence is meager on several significant points, we affirm.

In 1969 R. W. Norris and his brother, Morgan, formed a partnership and went into the business of preparing feed for livestock. Their specialty was grinding grain and hay and cubing alfalfa. This required the use of a large and expensive machine, which we will call Grinder X and which they acquired at some point during the overture to the actions which chiefly concern us. The process which they employed was the grinding of high-moisture grain, either so because green or because reconstituted by the addition of water. During these times, the steam-flaking process, a competitive method for processing grain, was finding increasing favor in the Panhandle of Texas and in adjacent areas of New Mexico where the Norris brothers operated, to such a degree as to threaten the grinding method with obsolescence.

Against this background, word reached the Norrises in 1970 that defendant Bovina, a large feedlot operation located in the Texas-New Mexico border area between Farwell and Bovina,[1] Texas, had decided to contract out its feed-grinding on the stated rationale that cowboys were not grain grinders and experience was needed. They approached Bovina's then manager and offered their services. After consultation with his board of directors and further negotiations, a verbal bargain was struck under which the Norris brothers were to grind Bovina's feed requirements for four years, anticipated to exceed fifty thousand tons annually. In consideration of the sixe and duration of the arrangement, the Norris partnership agreed to do the work for a substandard

---

1. Once known as Bull Stop, but since elevated and Latinized.

unit price of six cents per hundred-weight of feed ground and to purchase Bovina's feed grinding machine (the Grain King) for twenty thousand dollars. There was testimony that at the time and in the area this was a handsome price indeed for the machine, in view of the inroads being made by the steam-flaking process. Terms of payment were lenient; the price was to be paid in four equal annual increments, without interest, and the Grain King was to remain on Bovina's premises until paid out. As noted, the agreement was oral.[2] This was, R. W. Norris testified, a large and important job for the partnership, since they had not been in business very long. To be sure to do "the right kind of job" they bought a twenty-thousand-dollar front-end loader, which they had no other use for and would not otherwise have purchased.

Thus equipped, they fell to and completed the fall grinding season on green grain to the apparent satisfaction of all hands. From there, they took Grinder X with them to Hobbs, New Mexico, to do cubing of hay, leaving the Grain King with Bovina as agreed.

In February, we find them again in the Bovina-Farwell area, preparing to take Grinder X to Washington State to grind and cube alfalfa for export. At this time, Bovina's manager told them the grain for the spring season was already on contract and would be ready sometime in April. Nothing was said about Bovina's backing down on the word it had out to the Norrises.

Bovina had decided, however, or decided very quickly after their departure for Washington, to install its own steam-flaking process. About the same time, Bovina engaged a new general manager, Franz Lee Hicks. Hicks located R. W.

Norris in Washington State and, according to Norris, gave him to understand that they were through and should come down, pay for the Grain King and get it off Bovina's premises. Norris personally appealed over Hicks' head to the president of Bovina but was advised that Hicks was the manager and matters would have to be worked out with him. Financially unable to respond to Hicks' demand, R. W. Norris returned to work in Washington State and hoped for the best. About this time, Morgan Norris chose his family over the nomadic life dictated by the work of the partnership, which was dissolved. Morgan continued for a time as an employee, and R. W. Norris took over the partnership's assets and liabilities.

Meanwhile, back at the feedlot, matters with the new steam-flaking installation had gone more slowly than expected. Swallowing hard (presumably), Hicks again located R. W. Norris in Washington, asking him to return to Texas and grind for Bovina temporarily until the new process came on stream. Norris agreed to do so. Nothing was said about the old agreement, and R. W. Norris simply reported to Bovina's yard ready to go to work, Morgan and another employee accompanying him.

And at this juncture, Norris' apparently supremely accommodating nature received another test: Hicks told him that Bovina would not allow him to use the Grain King grinder on the temporary job he had returned to do until he obtained and presented for Bovina's inspection a written "release" from his brother Morgan. What sort of release was envisioned by Hicks' diktat is the subject of confusion in the record. Morgan Norris testified that he understood Hicks to be demanding that he release Bovina from its four-year contract.[3]

---

2. Bovina does not seriously dispute that the agreement was as stated, relying instead on the Statute of Frauds. It appears that the contract was not performable within one year; R. W. Norris testified that the Grain King was to remain on Bovina's premises for the four years of the contract and that the $5,-000 annual payment was to be withheld by

Bovina from amounts due for grinding services.

3. Hicks, who was acting on legal advice at this point, doubtless felt no need to have R. W. Norris release the contract, having entered into a new and shortened agreement with him on the subject matter.

And since there was no evidence that Hicks' demand was made to anyone but R. W. Norris, it being undisputed that Hicks never mentioned it to Morgan directly or asked him to sign any kind of instrument, presumably this represented R. W. Norris' belief also, communicated to Morgan. Hicks testified, on the other hand, that he merely meant a release from Morgan, a former partner, for the use of the machine by R. W. in his new capacity as sole proprietor. Hicks explained that in requiring the release he was prompted by his concern that Morgan be treated fairly by his brother, and that Morgan could not "come back against" Bovina for letting R. W. use property of the former partnership in fulfilling his temporary grinding contract. At any rate, the release was not forthcoming, the Grain King sat idle, and Norris did the job with Grinder X.

By so doing, he testified, he lost a job which he had in New Mexico, which would have required the use of Grinder X in conjunction with his cubing machine. On his evidence, at this work he would have produced eight to twelve thousand tons of cubes at a profit, according to his cubing experience, of about $3.83 per ton. A choice between the jobs was forced on him by Bovina's refusal to let him use the Grain King since he did not have the economic resources to acquire a third grinder: ". . . we was already fully loaded." Hicks admitted that Norris complained and asked several times to be allowed to use the Grain King, but was refused each time because he did not have Morgan Norris' written release. In late August of 1971, after he had finished the job with Grinder X, Norris filed this action. Later, he presented Bovina a written bill of sale or gift to him of Morgan's interest in the Grain King, paid Bovina the balance due on it, and received possession upon receipting 'for it as intact and in satisfactory condition.

Trial to a jury on the above evidence produced a special verdict as follows:

1. R. W. Norris had Morgan Norris' consent to use the Grain King in performing his temporary grinding job for Bovina in summer 1971.

2. Bovina knew he had it.

3. Despite Norris' request, Bovina, acting by an officer authorized or apparently authorized to do so, refused and prohibited him from using the Grain King.

4. Norris did not agree or acquiesce in this refusal.

5. Bovina's refusal proximately caused damages to R. W. Norris.

6. The amount of these was $30,640.-00.[4]

On this appeal, Bovina presents four grounds for reversal, couched in eight points.

 The first point asserts that the claim on which Norris recovered, wrongful refusal of the use of the Grain King, was outside the pleadings and pretrial order, so that Bovina lacked fair notice of it. Plaintiff's second count for relief complained that Bovina converted the Grain King and, asserting that interest from the date of the conversion would not fairly compensate plaintiff, asked for recovery of the loss of its use. The pretrial order defines a claim for ". . . the reasonable value of the use of such grinder which was lost to the partnership and hence to this Plaintiff. . . ." as a result of Bovina's actions. These are somewhat elliptical statements of a claim intended as one for damages measured by what plaintiff could have earned elsewhere using Grinder X, which Bovina's actions required plaintiff to substitute for the withheld Grain King. But it was indeed the Grain King's use of which Norris was deprived, and he was not obliged to plead the method by which he proposed

---

4. Obviously computed by multiplying $3.83, Norris' estimated profit per ton on the lost New Mexico cubing job, by 8,000, his lowest figure for the tonnage he would have produced there.

to measure his damages. We do not think Bovina was misled. Moreover, evidence of the lost New Mexico earnings came in without objection on any such ground, and the issue was, if sketchily pleaded, therefore tried by implied consent. Fed.R.Civ.P. 15(b).

■■■ Bovina next asserts that its repeated denial to Norris of the use of the Grain King was not actionably wrongful. Its argument proceeds along lines that a technical conversion was not shown since, having lawful possession, it could not by mere words have done so or, if it did not have possession, its words were of no force and Norris could and should have disregarded them. We are unimpressed. Bovina's actions seem to fall easily within the language of our own Texas diversity decision, which Bovina cites to us, of Bankers Life Ins. Co. v. Scurlock Oil Co., 447 F.2d 997, 1004 (5 Cir. 1971):

> Conversion is defined as the unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner.

Bovina's contention based on lawful possession is disposed of by Texas cases cited in the brief, establishing the general Texas rule that one in lawful possession of another's property may become liable for conversion upon a demand and refusal to deliver. *E. g.*, Hull v. Freedman, 383 S.W.2d 236 (Tex.Civ. App.—Ft. Worth 1964, writ ref'd, n. r. e.); see 14 Tex.Jur.2d 12. The machine was on Bovina's premises, of which it presumably had effective control, and we view the jury's finding that Bovina prohibited its use by Norris as supported by the evidence and reasonable inferences therefrom. That Norris, as successor to Norris Brothers, was the Grain King's owner seems plain: the very instrument which Bovina advances to establish its lawful possession recites a sale to Norris Brothers. It is really undisputed that Hicks, acting for Bovina, gave Norris repeated wrongful orders not to use the Grain King, orders which Hicks expected Norris to obey and which he did obey. This was enough.

■■ Bovina next asserts that Norris is not entitled to recover for any wrong it did, since any done was to the partnership. There is no merit in this contention: the Norris brothers testified with one voice and without dispute that the partnership was dissolved before the last grinding job for Bovina and that Morgan worked that job as his brother's employee. The wrong was to R. W. Norris.

Bovina's most serious ground for reversal, and that presenting the close questions, is its claim that lost profits from the New Mexico job foregone are an improper measure of damages: remote, speculative, excessive, and beyond any reasonable contemplation of the parties.

■■ Since Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (1938), in which earlier and more restrictive decisions were departed from, it has been the Texas law that lost profits of a business may be recovered as damages if the business is shown to be established and profitable at the time of the tort or breach of contract. The Texas rule, its qualifications, and the authorities establishing it are exhaustively reviewed and set out by Judge (now Justice) Pope in Atomic Fuel Extraction Corp. v. Slick's Estate, 386 S.W.2d 180 (Tex.Civ.App., San Antonio 1965, writ ref'd, n. r. e.). The rule rests on reasoning that pre-existing profits, in the total context of circumstances, may supply the requisite legal certainty as to both fact and amount of damages, whereas to award as damages the hoped-for profits of a new and unestablished business is to leave too much to conjecture and speculation. It is this Texas rule upon which our inquiry must focus since, as the pretrial order quoted above shows, Norris' claim was for injury to his *business*. We therefore lay to one side such Texas authorities as Reid

v. El Paso Construction Co., 498 S.W.2d 923 (Tex.Sup.1973), also by Justice Pope, which we read as requiring specific notice to the tortfeasor of unusual agreements or particular arrangements outside the regular course of a business before he can be charged with damages for frustrating them. This rule would govern had Norris sued, for example, to recover profit lost because of actions by Bovina which interfered with an advantageous sale of the Grain King, arranged by him and unknown to Bovina, and would doubtless be fatal to such a claim.

The jury was carefully instructed by the court below to find damages *vel non*, and only such damages as might have been reasonably foreseen as naturally flowing from Bovina's actions and were ascertainable with reasonable certainty, without speculation. Was there evidence meeting Boeing Co. v. Shipman, 411 F. 2d 365 (5th Cir. 1969), standards that supports the verdict? The proof upon which their finding rests is somewhat slender, but essentially undisputed. R. W. Norris testified that, had his business not been crippled by Bovina's wrongful refusal to let him use the Grain King, he would have been able to do another specific job which he had arranged for Grinder X. He had experience in such work, and his experience indicated a cost per unit processed of $8.17 and a return of $12.00. He estimated the lost job at eight to twelve thousand such units. No one contradicted him or seriously disputed his evidence, and if believed, it certainly established that interest on the value of the Grain King for the summer of 1971 would not adequately compensate his loss.

There was evidence that his business was established. At the time of the tort he had been in it since 1969 and had sufficient resources to acquire the expensive front-end loader for the Bovina job. Bovina made no complaint of the manner in which he performed such of the rather large job as he was permitted to perform. That such claims tend to be generated by disputes such as this is a fact familiar to men of ordinary experience. Certainly Bovina knew that he employed his equipment elsewhere when not in their service: its manager Hicks located him at work in Washington to recall him to Texas. Thus, though Norris' case would not have suffered from more ample proof, we think it was within the jury's province to conclude Bovina could reasonably have foreseen that by wrongfully immobilizing one-half of the grinding equipment of this feed-grinding business it was costing it some amount of profit. And, though Norris admitted he was financially straited by Bovina's actions, his testimony was that he "was fully loaded"—not that he was sinking.

We are somewhat uncertain whether a Texas court would require stringent proof of general profitability of a business such as Norris', which was plainly a going concern and known to be such by the tortfeasor, and where the proof was, though meager, clear that the specific job lost was in the regular course of business and would have been profitable—profitable enough, from the amount the jury found, to convert a loss year into a gainful one for many small enterprises such as his. And though we hold that the evidence was sufficient— barely sufficient—to support a conclusion of general establishment of a going concern, we indulge as an additional ground in an *Erie* guess that stringent proof would not be required in these circumstances falling, as they may be seen, somewhere in the area between the rules of the Texas *Reid* and *Atomic Fuel* decisions cited above. In our guess, we are comforted by Commercial Credit Equipment Corp. v. Elliott, 414 S.W.2d 35 (Tex.Civ.App.—Eastland 1967, writ ref'd n. r. e.), where cotton harvesting equipment was wrongfully sequestered and profits for loss of its use were

**508**

allowed.[5] Elliott was regularly in the cotton harvesting business, and there was clear testimony that he lost a profitable season by the defendant's wrongful act in depriving him of his equipment. If there was evidence in the record of the general profitability of Elliott's business, the opinion lays no emphasis on it. Stressed instead is that he was regularly *in* the cotton harvesting business, and that the work lost would have been profitable. And Elliott, like Norris, was financially unable to procure other equipment—or even to make a replevin bond. We conclude that the damages shown by Norris were not fatally remote or speculative.

■ The argument that they were excessive observes that Norris was awarded more for loss of the Grain King's use than the machine itself was worth, and points to other evidence which might have moved the jury to award a lesser amount. As noted above, however, there was specific testimony which supported the damages found and which would have supported more. And while the value of the thing withheld or converted doubtless has some rough relevance to calculating damages for loss of its use, there is no necessary logical connection between the two. An iron logic tells us that a surgeon may be deprived of a five-hundred-dollar fee by withholding his five-dollar scalpel, while experience observes that he probably has or could easily get a replacement for such an inexpensive instrument. Here, the "instrument" was expensive, and there was undisputed testimony that Norris was financially unable to replace it. We cannot say that the damages found by the jury were excessive.

■ The action of the court below in directing a verdict for Bovina on the claim grounded in breach of the four-year oral grinding contract must also be

affirmed. Our Circuit's view of the applicable Texas law, expressed in 21 Turtle Creek Square, Ltd. v. New York State Teachers' Retirement System,[6] requires an estoppel to invoke the Statute of Frauds grounded in a promise, additional to the oral agreement sought to be enforced, to reduce it to writing. No evidence of any such promise appears in this record.

Affirmed.

---

5. Though the "no reversible error" writ notation of the Texas Supreme Court in *Elliott* indicates that Court's want of satisfaction that the opinion has correctly declared the law, it also indicates that the result presents no

error meriting reversal. Thus, the allowance of lost profits as damages in the case, a major part of that result, can scarcely have been thought erroneous.

6. 432 F.2d 64 (5th Cir. 1970).